**CHIN BICK WAH, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 15268.**

United States Court of Appeals
Ninth Circuit.

May 28, 1957.

Rehearing Denied Aug. 9, 1957.

James T. Davis, San Francisco, Cal., for appellant.

Lloyd H. Burke, U. S. Atty., James B. Schnake, Marvin D. Morgenstein, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before STEPHENS, CHAMBERS and BARNES, Circuit Judges.

CHAMBERS, Circuit Judge.

This case deals with how a citizen of China, the appellant Chin Bick Wah, now also known as Helen Fong, made her way (or was brought) into the United States in 1952 from Hong Kong. Her age is now about 38.

She stands convicted of a conspiracy count involving the immigration laws. Also, she was convicted on a substantive count, the sixth in the indictment. In the latter count, the charge of the indictment is that on March 5, 1952, at Hong Kong she made false statements in her written application[1] for the immigration visa and alien registration in that she stated:

1. She was married to Jonathan K. Yee;

2. Her passage was paid for by her husband Jonathan K. Yee;

3. She intended to join her husband Jonathan K. Yee in the United States.

A concurrent sentence of one year's imprisonment on each count was imposed.

■ On this appeal, with identical sentences, we need not examine both convictions, if we find one free from reversible error. Goldbaum v. United States, 9 Cir., 204 F.2d 74. We are satisfied from examining it that defendant's conviction on the conspiracy count was wholly proper and withstands appellant's claim of error. However, the substantive count conviction is the one we choose to discuss.

Now for some facts. Fong Wy Sum,[2] herein William Fong, operates a milk store in San Francisco's Chinatown. He is a merchant of some consequence there. William is now about 49 years old. Jonathan Yee, now approximately 35 years old, who gained admission to the United States in 1939, testified that he is actually a first cousin of William Fong: that Fong in 1939 helped him (Jonathan) get into the United States under a false name and with false papers.[3] The district attorney would draw the inference in the events with which we are here concerned that Yee was subject to blackmail and had to pursue about any motion that William dictated. Jonathan served in the army of the United States from

1. See 18 U.S.C.A. § 1546.

2. William Fong and another were jointly charged with Chin Bick Wah in the Conspiracy or first count of the indictment. Then he alone was charged with substantive counts numbered two, three, four and five. Count six, the substantive count on Chin Bick Wah, concerned her alone. At the conclusion of the trial, and before the jury retired to deliberate, William Fong entered a plea of guilty.

The third defendant under count one, a San Francisco lawyer, was ultimately exonerated by the trial judge after the jury failed to agree on the lawyer's guilt.

3. Apparently Jonathan entered as a "derivative" citizen under R.S. Sec. 1993, 34 Stat. 1229, [Immigration and Nationality Act 1952, 8 U.S.C.A. §§ 1431–1433]. A "paper father" who resided in the United States and was a citizen was conveniently supplied him.

May, 1944, until sometime in 1946. Generally, after returning to San Francisco from the army, and until 1952 at least, he worked for Fong in the milk business.

Possibly, economy of words can be achieved here by now setting up a marriage and divorce chronology of William Fong and Jonathan Yee:

| ————, 1924, | William Fong marries Gee Kee Yip in China. She is brought to the United States in 1932 with one child, a daughter, born to this marriage prior to 1932. |
| September 8, 1947, | Jonathan Yee at Reno, Nevada, marries Jean Jow. She is an American born Chinese. |
| May 11, 1951, | Jonathan Yee at Reno divorces Jean Jow. Divorce decree provides for custody and support of three year old daughter Joanne. |
| November 29, 1951, | Jonathan Yee marries Chin Bick Wah (later called Helen) in Hong Kong. |
| May 31, 1952, | Jonathan Yee and Chin Bick Wah remarry at Reno. |
| October 24, 1952, | William Fong at Reno divorces Gee Kee Yip, his wife of 28 years. |
| July 28, 1953, | Chin Bick Wah (Helen) divorces Jonathan Yee at Reno. |
| October 1, 1953, | William Fong marries Chin Bick Wah (Helen) in San Francisco. |
| ————, 1955, | Jonathan Yee, remarries his first wife, Jean Jow, a second child (a son) having been born to Jonathan and Jean on June 2, 1952, a date on which Jonathan was married to Helen. |

We think it a fair assumption to state that resentment against William Fong and Chin Bick Wah by Jean Jow Yee and her sister, May Jow, and Fong's daughter Vivian probably enabled the government agents to get their case against William Fong and Chin Bick Wah started. The feet of these three women apparently were fixed firmly on the United State soil beyond chance of dislodgment.

■ Under the sixth count, the one against her alone, there was a failure of proof that Chin Bick Wah (henceforth usually referred to as Helen) knew that Jonathan Yee did not pay for her ticket from Hong Kong to San Francisco. On the second prong of the sixth count, it was charged the statement of Helen was false when she swore she was married to Jonathan Yee. That involves some difficult law. Does a party (assuming belief by the fact trier) who has participated in a sham marriage (lacking an intent to really marry) make a false statement when she says she is married? We shall lay this second prong to one side.[4]

Thus, we come to the third accused statement in the second count: that

4. Rather comprehensive instructions were given the jury on the subject of conspiracy, such being the meat of the first count. On the sixth count, Helen's alledged false statements, the instructions were brief and particularized only as follows:
"In the sixth count of this indictment the defendant Chin Bick Wah is charged with the offense of knowingly and wilful-
ly making a false statement in an application for an Immigration visa and alien registration in violation of Section 1546 of Title 18, United States Code, the pertinent portions of which provide as follows:
" 'Whoever knowingly makes under oath any false statement with respect to a material fact in an application * * * required by the immigration laws or reg-

Helen at Hong Kong on March 5, 1952, in her application to the vice consul falsely stated under oath that she intended to join her husband, Jonathan K. Yee, in the United States (if she should gain admittance thereto). In her application she made the statement. Was it a false statement?

We must address ourselves to the meaning of "join her husband." We do not think a fine delineation of what the three words mean is necessary. If on March 5, 1952, she was intending to come to the United States, meet her newly acquired, technical at least, husband, Jonathan Yee, (who in February had preceded her back to San Francisco) and to promptly commence living with him as man and wife, then she intended to join her husband. On the other hand, if on March 5, 1952, the state of mind of Helen was that she had married Jonathan as a matter of convenience to get to the United States and had no intention as of that date of ever cohabiting with Jonathan, we do not think an intent to greet Jonathan cordially at the San Francisco airport and to proceed through other open and empty formalities would absolve her.

■ In this court, we cannot weigh the evidence. Appellant's counsel earnestly ɛ ᵓues that the evidence was insufficient. He and Helen can point to facts such as:

1. There was a marriage, regular in form, of Jonathan and Helen in Hong Kong on November 29, 1951.

2. On the night of March 16, 1952, Jonathan signed the register in an Oakland Hotel "Mr. and Mrs. Jonathan Yee." And at least Helen immediately occupied the room for which the registration was made. (March 16 was the day Helen arrived in San Francisco from Hong Kong.)

3. On May 31, 1952, Jonathan and Helen went to Reno and again they were participants in a marriage ceremony.

4. In August, 1952, Jonathan and Helen traveled together (with Jonathan's two children born to Jean) to Seattle where they lived together for a substantial portion of one month.[5]

All of the above is consistent with Helen's innocence in saying on March 5, 1952, that she intended to come to the United States to join her husband.

Intent here must be largely circumstantial, but the prosecutor has some pretty good circumstances.

1. The jury might believe that before Jonathan arrived in Hong Kong in October, 1951, Helen had been in correspondence with William Fong and not at all with Jonathan.

2. The jury might believe that Helen overheard Jonathan talking from Hong Kong to San Francisco to William Fong and Jean Jow Yee before the marriage ceremony. From those conversations, if related to the court truthfully, she may have known (if it could be possible she didn't know before) that she was destined for William Fong—not Jonathan

ulations prescribed thereunder * * * shall be guilty of a public offense.'

"In connection with the charge contained in the sixth count of the indictment against Chin Bick Wah whose conduct is alleged to have taken place at Hong Kong, the United States Code [18 U.S.C.A. § 3238] provides as follows:

" 'The trial of all offenses begun or committed upon the high seas or elsewhere out of the jurisdiction of any particular state or district, shall be in the district where the offender is found or into which he is first brought.' "

Apparently, the instruction was agreeable to the appellant here. No request was made that the jury be instructed there was a failure of proof on one or two of the representations listed in the

sixth count. And there was adequate evidence, we hold, of the falsity on the representation by Chin Bick Wah that she intended to join her husband in the United States.

The possible objection that count six charged three offenses was never made by Chin Bick Wah. It is too late now. And, probably she was well advised not to make it. Such action could have resulted in three counts instead of one. See Arena v. United States, 9 Cir., 226 F.2d 227.

5. The prosecutor probably argued within proper bounds and with much force that the purpose of the remarriage and the short period of cohabitation of Helen and Jonathan was to excite William Fong to produce some promised consideration.

Yee—and that from her he hoped to have a male heir.

3. The jury may have believed that at no time from November 29, 1951, the date of Helen's ceremonial marriage in Hong Kong, to the day in February, 1952, when Jonathan flew back to San Francisco, did Helen cohabit with Jonathan.

4. The jury may have believed that while Jonathan was in Hong Kong he requested money of William Fong in San Francisco and that Fong sent the money to Helen, not Jonathan, and Helen used it.

There were enough events preceding March 5 to find that on that day Helen did not intend to come to the United States to "join my husband, Jonathan Yee" as she swore she intended to do.

And later events reasonably close in time can send inferences backward to the event which is asserted to be a crime. Of course flight, although there was none here, is the common example. See Wigmore on Evidence, 3rd Ed. § 276.

When Helen reached San Francisco on March 16, 1952, there were a number of events which may have properly influenced the jury.

1. The jury may have thought that it was significant that apparently Helen was not disturbed when Jonathan brought Jean, by now in advanced pregnancy with her second child, to the San Francisco airport to greet her, Helen.

2. The jury may have thought that Helen, leaving the San Francisco airport, rode in a separate car to the Oakland hotel via a celebration in San Francisco, there at Oakland to have Jonathan register her in and then leave to go back home in San Francisco to cohabit with Jean. The jury may have thought that over this ungroomlike conduct Helen made no outcry. (And it does seem rather clear from the evidence that Helen did have a temper.)

3. The jury may have believed that within a day or two after arriving in San Francisco, Helen was demanding that Gee Kee Yip divorce William Fong so she (Helen) could claim him as her prize.

4. The jury may have thought that Helen after arriving in the United States did demand that William Fong give her some property first before she would marry him and that the idea of demanding it did not originate after March 5, 1952.

There were many things not too remote either way from March 5 from which the jury could conclude that Helen on March 5, intended to come to the United States to "join" William Fong, or just to come to the United States, and not to "join" Jonathan Yee. See Wigmore on Evidence, 3rd Ed. §§ 267, 268.

Then, like flight, the ridiculousness of an alibi, sworn in court, or unsworn and out of court, can give some affirmative inferences. Particularly is this so on the matter of intent which can never be mathematically established. On December 21, 1955, Helen was questioned by immigration officers in San Francisco concerning how she came to the United States. These questions and her answers came into evidence. The degree of improbability of some of the answers in her "alibi" point to a likelihood that on March 5 she had no intent to come to the United States to "join" Jonathan Yee.

There was ample evidence on the substantive count. Only a portion of it we have detailed. Likewise, the conspiracy, as we have indicated, was amply proved.

█ On the substantive count we have considered whether we have imposed too strict a meaning on the word "join." We do not think our decision is captious. We think if the jury thought that the game of musical chairs, i. e. the husband swapping, was all a part of a plan in which Helen was a knowing participant and by which she would get into the United States by becoming Jonathan Yee's wife in name only, there is no unfairness in convicting her for saying she intended to "join" her husband.

We conclude the evidence was sufficient to support the verdict and judgment.

Judgment affirmed.