Jorge Gabriel ROCHA, Joao Da Paixao Andrade, Manuel Correia Da Luz, Jose Da Silva Da Luz, Francisco Da Silva Rodrigues, Manuel Das Neves Virrissimo, Appellants,

v.

UNITED STATES of America, Appellee.

No. 16839.

United States Court of Appeals Ninth Circuit.

March 2, 1961.

Verne O. Warner, and John S. Rhoades, San Diego, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., Robert J. Jensen, George W. Kell, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before ORR, BARNES and HAMLIN, Circuit Judges.

BARNES, Circuit Judge.

The six appellants, herein known as "immigrant defendants," with eight indicted coconspirators (herein known as "coconspirators") and six unindicted coconspirators (herein known as "brides") were charged with conspiracy to defraud the United States. The object of the conspiracy was to permit the six immigrant defendants to make an unlawful entry into the United States, as immigrants in a claimed preferred status, viz. as husbands (through alleged sham marriages) to the United States citizen brides. 8 U.S.C.A. § 1325. Jurisdiction is claimed generally under 18 U.S.C. § 3231; and more specifically under 18 U.S.C. §§ 3237, 3238. We do not find 18 U.S.C. § 3237 applicable.

Additionally, each appellant was charged in three substantive counts of (a) knowingly making a false oath before a consular officer abroad (18 U.S.C. § 1546); (b) obtaining and accepting an immigrant visa by means of a false statement with respect to a material fact in a visa application; and (c) accepting and retaining an alien registration permit card so fraudulently obtained.

Each defendant was convicted on the conspiracy count (I), and one count charging the making of the false statement (the so-called Count II series). Each defendant was acquitted of the remaining two counts.

There are two principal questions raised on this appeal. The first relates to the conspiracy count, i. e., whether there were not six separate conspiracies, rather than a single conspiracy. Appellants admit arguendo that they and their "brides" and the eight indicted coconspirators entered into six *different* conspiracies, but all urge the conspirators did not enter into, nor was there any proof of, any one over-all conspiracy— merely "six separate, individual and unconnected conspiracies." Reliance is placed on Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L. Ed. 1557; Cf.: United States v. Rus-

sano, 2 Cir., 1958, 257 F.2d 712; Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, certiorari denied 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597.

The second question raised is that the Count II series of convictions were based on the trial of an alien for a crime committed abroad, and hence these so-called "Count II" charges should have been dismissed for lack of jurisdiction in our district courts over a crime committed beyond the territorial limits of the court. Cf.: United States v. Baker, D.C.S.D. N.Y.1955, 136 F.Supp. 546. We consider the jurisdictional question first.

The penal § 1546 under which the Count II series were prosecuted reads in material part as follows:

"Whoever * * * uses, attempts to use, possesses, obtains, accepts or receives any immigration visa or permit, or other document required for entry to the United States, knowing it to be * * * falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained * * or

"Whoever knowingly makes under oath any false statement in any * * document required by the immigration laws or regulations * * * [S]hall be fined * * * or imprisoned * * *."

We have eliminated all references to those portions of this section dealing with the forging, uttering counterfeiting or altering of the visa or permit, as none of such actions was proved against any defendant. Nor was the document falsely "made" by any direct act of any defendant.

The several appellants' responsibility, then, rests upon their use, possession, receipt or acceptance of an immigrant visa issued to them on the representation that they were married to various American citizens, and therefore were nonquota immigrants under § 101(a) (27) (A) of the Immigration and Naturalization Act, 8 U.S.C.A. § 1101(a) (27) (A), "whereas

in truth and in fact, as [each] defendant well knew, his marriage to the said American citizen was a sham, false and fraudulent marriage."

This approaches a case of first impression. Cf.: United States v. Lutwak, 7 Cir., 1952, 195 F.2d 748, affirmed 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; United States v. Rubenstein, 2 Cir., 1945, 151 F. 2d 915, certiorari denied 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462; United States v. Birnbaum, D.C.S.D.N.Y.1944, 55 F. Supp. 356. This circuit did not pass on the question of jurisdiction, nor was that question raised, in the only case that apparently has arisen in this circuit under § 1546. Chin Bick Wah v. United States, 9 Cir., 1957, 245 F.2d 274, certiorari denied 355 U.S. 870, 78 S.Ct. 120, 2 L.Ed. 2d 76.[1]

In Lutwak v. United States, supra, the validity of the marriage was held immaterial, in view of the use to which the defendants intended to put it.[2] The conspiracy in Lutwak had the purpose of enabling defendants to make "illegal entries." That was the purpose of the conspiracy charged herein in Count I.

Such entries were listed as overt acts. Other overt acts allegedly took place wholly or partially in the United States. Entries were accomplished in both cases; in both cases the appellants, upon unlawful entry, later were found within the jurisdiction of the federal courts. Thus, no jurisdictional problem arose in Lutwak, nor is there any jurisdictional problem with respect to Count I (conspiracy) in this case.

■ But the substantive counts (Count II series) of which appellants were convicted do not rest on the overt acts of Count I. The court below, in a careful and able analysis of what Congress intended (182 F.Supp. 479, at pages 484–486) comes to the conclusion that Congress intended to give to § 1546 extra territorial jurisdiction. We agree that such was the congressional intent.[3] We are then faced with the question of whether such a purpose can be lawfully accomplished, i. e., is constitutional.

Before we reach that question, however, we believe it proper to consider certain allegations which the trial judge below inferred might have been an attempt

---

1. We did there raise the problem of whether a party who has participated in a sham marriage (lacking an intent to really marry) makes a false statement when he says he is married. But not thinking it necessary to the decision, we laid that question to one side, and affirmed the conviction on the making of another allegedly false statement, made in China, that the wife "intended to join her husband" when she got to the United States.

2. Under the "War Brides Act" a male and two female veterans married in France and brought their respective spouses into this country. They never lived together or consummated their marriages, at least until prosecution was instituted. They were charged with conspiring to violate 18 U.S.C. § 1546, and convicted; the conviction was affirmed on appeal (195 F.2d 748), and the Supreme Court affirmed the conviction. The validity of the marriage was held immaterial. In speaking of congressional intent, Mr. Justice Minton said for the Court:

"Congress did not intend to provide aliens with an easy means of circumventing the quota system by fake marriages in which neither of the parties ever in-

tended to enter into the marital relationship * * *. When one of the aliens stated that he was married, and omitted to explain the true nature of his marital relationship, his statement did, and was intended to, carry with it implications of a state of facts which were not in fact true." 344 U.S. 604, at pages 611–612, 73 S.Ct. 481, at page 486.

The opinion then cites with approval the language of the Rubenstein case, supra, that "for the purposes of that case, [the parties] were never married at all." While we may agree with the dissenting opinion that the government, a third party, in "simply ignoring the ceremony and its consequences," presents a close question of law (which we avoided in Chin Bick Wah, supra), nevertheless we are bound by the majority holding in Lutwak, supra, at least to the extent that proof of a sham marriage for the purpose of avoiding the immigration laws presents a question of fact that should, and must, go to the jury in a conspiracy case.

3. It is difficult to see how many of the offenses described in § 1546 could be committed by an alien were he not in a foreign country.

by the government to allege an act in each of the "Count II series" which would enable it and us to avoid the constitutional question. We agree with Judge Carter that despite such allegations (as to acts done within the United States by the "brides" as their "husbands'" agents), the offense charged in Count II as to the various bridegrooms was alleged to have been committed in Mexico (or elsewhere) on the date the papers were signed at the respective American Consulates, and thus the constitutional issue as to the Count II series remains before us. See 182 F. Supp. 479, 486, note 5.

This brings us to the point—can United States law have extra territorial jurisdiction? Or, more specifically as put to us by the appellants—does the district court have jurisdiction to indict and try an alien found within the court's jurisdiction for a crime committed abroad?

Appellants properly cite United States v. Baker, supra [136 F.Supp. 548], as holding that the district court does not, and properly cite The Apollon, 1824, 9 Wheat. 361, 22 U.S. 361, 6 L.Ed. 111, for the general rule, under the theory that territorial jurisdiction is essential, that "the laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens."

But, as appellants concede, Baker, supra, points out certain exceptions to the general rule.

"While crimes against private individuals must still take place within the territory of the sovereign before the latter can properly assume jurisdiction, certain crimes directed toward the sovereign itself may be tried within the jurisdiction even though committed without." Id., 136 F.Supp. at pages 547–548.

But this jurisdiction is usually "predicated upon the citizenship of the offender rather than the locus of the crime." United States v. Bowman, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149, and cases cited in Baker, supra, 136 F.Supp. at page 548.

The Baker opinion notes that "in only one instance has an *alien* been held accountable by the United States for a crime committed abroad." United States ex rel. Majka v. Palmer, 7 Cir., 1933, 67 F.2d 146. There the alien was ordered deported for having made false statements under oath to an American Consul abroad when applying for a passport. But, the Baker court stated, "deporting an alien for perjury is far different from indicting and trying him for a crime committed abroad." Baker, supra 136 F. Supp. at page 548.

We fail to see the purported distinction. Obviously the decision below herein rested not only on the act abroad, but also on the effect it produced within the boundaries of the United States, namely, the aliens' subsequent successful entrance at the border based on a document allegedly procured by fraud. This must have so occurred because the aliens were subsequently found and arrested within the United States, says the government. But suppose the act done abroad was the making of a false affidavit by "X" which enabled "Y" to enter the United States, and suppose further, "Y" never came into the United States, or entered on his own valid passport. Could "X" then be indicted? We see no reason why an alien coming within the territorial limits of a United States court should be placed in a more favorable position with respect to his actions taken against the sovereignty of the United States while he was abroad, than a United States citizen would be. We believe the principles enunciated by the Supreme Court in Strassheim v. Daily, 1911, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735, are here applicable. There Mr. Justice Holmes ruled:

"Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power." Id., 221 U.S. at page 285, 31 S.Ct. at page 560, citing cases, including American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 356, 29 S.Ct. 511, 53 L.Ed. 826.

And see: Ford v. United States, 1924, 273 U.S. 593, 620, 621, 47 S.Ct. 531, 71 L.Ed. 793; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 433; Ramirez & Feraud Chili Co. v. Las Palmas Food Co., D.C.S.D.Cal.1956, 146 F.Supp. 594, 600, affirmed 9 Cir., 245 F.2d 874, certiorari denied 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357.

The same rule logically should apply to national states, or nations. The acts done to violate § 1546 of Title 18 were all done outside the state, but they were intended (at least at the point of time when the fraudulent document was used to gain entry) to produce, and they did so produce, a detrimental effect on the sovereignty of the United States. Thus under "the protective principle," less well known than "the territorial principle," yet "claimed by most states," [4] there is, and should be, jurisdiction. A sovereign state must be able to protect itself from those who attack its sovereignty. This was said more elegantly long ago by the Supreme Court, and noted in the opinion below in note 8. Cf.: Church v. Hubbart, 1804, 2 Cranch 187, 234–235, 6 U.S. 187, 234–235, 2 L.Ed. 249.

█ We agree with the court below that there are no constitutional provisions which prohibit the exercise of jurisdiction over an alien found within the sovereign's territory, under the protective principle theory. We do not think it necessary to search the Constitution to find specific authorization for such a jurisdiction.[5] "The powers of the government and the Congress in regard to *sovereignty* are broader than the powers possessed in relation to internal matters." United States v. Rodriguez, S.D.Cal.1960, 182 F.Supp. 479, 490, citing United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 315, 57 S.Ct. 216, 81 L.Ed. 255. And see: United States v. Archer, D.C.S.D.Cal.1943, 51 F.Supp. 708, 711; United States ex rel. Majka v. Palmer, supra.

Several courts, including this one, have believed and assumed that such jurisdiction exists, even though not specifically considering the constitutional question. Chin Bick Wah v. United States, supra; United States v. Flores-Rodriguez, 2 Cir., 1956, 237 F.2d 405.

When we consider the direct and indirect holdings of our courts that such jurisdiction exists, and compare it with the one case (Baker, supra) which holds to the contrary, we are, like the court below,[6] unimpressed by the Baker reasoning, and are, of course, not bound by it.

4. "These five general principles are: first, the territorial principle, determining jurisdiction by reference to the place where the offence is committed; second, the nationality principle, determining jurisdiction by reference to the nationality or national character of the person committing the offence; third, the protective principle, determining jurisdiction by reference to the national interest injured by the offence; fourth, the universality principle, determining jurisdiction by reference to the custody of the person committing the offence; and fifth, the passive personality principle, determining jurisdiction by reference to the nationality or national character of person injured by the offence. Of these five principles, the first is everywhere regarded as of primary importance and of fundamental character * * *. The third is claimed by most states, regarded with misgivings in a few, and generally ranked as the basis of an auxiliary competence."
United States v. Rodrigues, D.C., 182 F.Supp. 479, at page 487, citing Research on International Law, Part II, Jurisdiction with Respect to Crime, 1935, 29 Am. J. Int'l L.Supp. 435 at 445.

5. The court below relied on Art. I, Sec. 8, Clause 10, which provides:
"The Congress shall have Power * * * To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." (Emphasis added.)
It has been suggested in an interesting note in 13 Stanford Law Review 155 (December, 1960) entitled: Federal Jurisdiction Over Crimes Committed Abroad by Aliens, at pp. 157–58, that there exists a specific grant of power under the "necessary and proper clause" (Art. I, Sec. 8, Clause 18) to establish "an Uniform Rule of Naturalization." (Art. I, Sec. 8, Clause 4.) But see Garcia-Mora article, 19 U.Pitt.L.Rev. 567 (1958).

6. See discussion, United States v. Rodriguez, D.C., 182 F.Supp. 479, at pages 492–494.

We affirm the district court's holding as to the substantive Count II series that it had jurisdiction over the alien found within its borders who had violated a statute passed to preserve the sovereignty of the United States.

This brings us to the consideration of what is appellants' first point, and one which they urge as their "main question" —was there one large conspiracy or six separate, individual and unconnected conspiracies? This was not a question raised on the motion to dismiss heard and determined by the court below prior to trial. Cf.: 182 F.Supp. 479.

. Here the "common key figure" of the conspiracy, so the government urges, was Kathleen Walker. We consider the facts.

June Ruth Jones, one of the "brides," was approached by one Mary Drummond, was introduced by Drummond to her "bridegroom," was paid in part by Drummond, and in part by Mary Rodrigues. Bride Jones was instructed by Drummond as to what to say to Immigration Officers, what to write to her husband, and who to go to (Reese, a notary public) to prepare the necessary petition upon which her "husband" was to enter the United States. Kathleen Walker first comes into this "transaction" by being *present* at the marriage (she was herself married at that time), and at the preparation of the petition, but it was Drummond, not Walker, who was the moving party.

Again, it was Mary Drummond who introduced Kathleen Walker to her intended husband's family, and who paid Kathleen Walker for going through with the marriage.

Kathleen Walker apparently was an enthusiastic convert. She interested Betty Jane Fleming in "marrying" one of the appellants, and took Fleming to Tijuana to meet her "intended husband," and to the notary's office, and was paid $25.00.

Kathleen Walker arranged the marriage of Deborah Good, took her to the notary, and to the Immigration Office to file her petition.

Kathleen Walker introduced Sharon Metstrom to her "intended husband," but Sharon had first been contacted by Deborah Good. Walker also arranged the marriage of Karen Moody to her "husband."

Thus we can readily see why Kathleen Walker could be indicted and convicted of a conspiracy. But no one else (save perhaps June Ruth Jones or Drummond) apparently had any interest in any marriage other than their own; obviously each young lady was interested only in what was in it financially for her. One or two were present when some one of the others performed one or two of the alleged overt acts, but they were incidentally present, as mere spectators, and not as participants. The mother of two of the appellants, Matilda Da Silva Da Luz, was involved with two marriages, because her two sons were participants. She was not interested nor were the families of any "immigrant defendants" in the marriages of anyone not related to them. And in no event was any of the men here a defendant interested in any marriage but his own.

The Lutwak case, supra, is referred to by the government as being based "on very similar evidence," and by it the government seeks to justify this conspiracy indictment, and avoid the holding of the Kotteakos, supra, case. We therefore consider its facts at some length.

"The petitioners, Marcel Max Lutwak, Munio Knoll, and Regina Treitler, together with Leopold Knoll and Grace Klemtner, were indicted on six counts in the Northern District of Illinois, Eastern Division. The first count charged conspiracy to commit substantive offenses set forth in the remaining five counts and conspiracy 'to defraud the United States of and concerning its governmental function and right of administering' the immigration laws and the Immigration and Naturalization Service, by obtaining the illegal entry into this country of three aliens as spouses of honorably discharged veterans. Grace Klemtner was dismissed from the indictment before the trial because her constitutional

rights had been violated before the grand jury. At the conclusion of all the evidence, the District Court dismissed the substantive counts against all of the defendants because venue had not been shown in the Northern District of Illinois. The jury acquitted Leopold Knoll and convicted the three petitioners on the conspiracy count. The Court of Appeals affirmed [7 Cir.], 195 F.2d 748, and we granted certiorari, 344 U.S. 809, [73 S.Ct. 13, 97 L.Ed. 630].

"We are concerned here only with the conviction of the petitioners of the alleged conspiracy. Petitioner Regina Treitler is the sister of Munio Knoll and Leopold Knoll, and the petitioner Lutwak is their nephew. Munio Knoll had been married in Poland in 1932 to one Maria Knoll. There is some evidence that Munio and Maria were divorced in 1942, but the existence and validity of this divorce are not determinable from the record. At the time of the inception of the conspiracy, in the summer of 1947, Munio, Maria and Leopold were refugees from Poland, living in Paris, France, while Regina Treitler and Lutwak lived in Chicago, Illinois. Petitioner Treitler desired to get her brothers into the United States.

\* \* \* \* \* \*

"The first count of the indictment charged that the petitioners conspired to have three honorably discharged veterans journey to Paris and go through marriage ceremonies with Munio, Leopold and Maria. The brothers and Maria would then accompany their new spouses to the United States and secure entry into this country by representing themselves as alien spouses of World War II veterans. It was further a part of the plan that the marriages were to be in form only, solely for the purpose of enabling Munio, Leopold and Maria to enter the United States. The parties to the marriages were not to live together as

husband and wife, and thereafter would take whatever legal steps were necessary to sever the legal ties. It was finally alleged that the petitioners conspired to conceal these acts in order to prevent disclosure of the conspiracy to the immigration authorities.

\* \* \* \* \* \*

"From the evidence favorable to the Government, the jury could reasonably have believed that the following acts and transactions took place, and that the petitioners conspired to bring them about. Lutwak, a World War II veteran, was selected to marry Maria Knoll, his aunt by marriage. He went to Paris where he went through a marriage ceremony with Maria. They traveled to the United States, entering the port of New York on September 9, 1947. They represented to the immigration authorities that Maria was the wife of Lutwak, and upon that representation Maria was admitted. They never lived together as man and wife, and within a few months Munio and Maria commenced living together in this country as man and wife, holding themselves out as such. Lutwak, in the meantime, represented himself to friends as an unmarried man. Lutwak and Maria were divorced on March 31, 1950.

"Lutwak and Mrs. Treitler also found two women—Bessie Benjamin Osborne and Grace Klemtner—who were honorably discharged veterans of World War II, and who were willing to marry Munio and Leopold so that the brothers could come to the United States. Bessie Osborne was introduced to Treitler by Lutwak, and went to Paris accompanied by Treitler. There she went through a pretended marriage ceremony with Munio Knoll, and on their arrival at New York City, Munio was admitted on November 13, 1947, on the representation that he was married to Bessie Osborne. The marriage was never consummated and was never

intended to be. The parties separated after entering the United States, and they never lived together as husband and wife at any time. Bessie Osborne's suit for divorce from Munio was pending at the time of the trial.

"Still later, Grace Klemtner, who was also a World War II veteran and an acquaintance of Regina Treitler, went to Paris and went through a pretended marriage ceremony with Leopold. They then traveled to the United States, where Leopold was admitted on December 5, 1947, upon the representation that he was the husband of Grace Klemtner. They immediately separated after their entry into this country, and they never lived together as husband and wife at any time until about the time Grace Klemtner appeared before the grand jury which returned the indictment. This was approximately April 1, 1950, more than two years after the marriage ceremony in Paris. Bessie Osborne and Grace Klemtner received a substantial fee for participating in these marriage ceremonies.

"There is an abundance of evidence in this record of a conspiracy to contract spurious, phony marriages for the purposes of deceiving the immigration authorities and thereby perpetrating a fraud upon the United States, and of a conspiracy to commit other offenses against the United States." Lutwak v. United States, supra, 344 U.S. at pages 605–610, 73 S.Ct. at page 483.

Thus the Lutwak case might be authority to hold Kathleen Walker, and perhaps June Jones or Mary Drummond, as conspirators, or even to hold Mrs. Matilda Da Silva Da Luz as such a conspirator, but we see no basis for even an inference that any one "husband" was interested in anyone's marriage or entry other than his own. Nor do the remaining cases cited by the government aid them on this phase of the case.

In Shimi Miho v. United States, 9 Cir., 1932, 57 F.2d 491, Miho advised Ogo to represent he was the same person as another Japanese, who had previously entered the United States, first under the name of Yokota and later under the name of Ito. Ogo's claimed innocence of knowledge of the falsity of his statements, if believed, would have eliminated conviction of a conspiracy, but this court held there was a sufficient factual dispute to properly permit the jury to decide that issue.

In United States v. Rubenstein, supra, the appellant had fraudulently obtained a signature upon a blank petition for a visa for the alien Spitz from Sandler, the husband, for convenience of the alien Spitz. The defendant filed another false affidavit and a false letter of financial worth with the American Consul at Montreal, Canada; and Spitz entered from Canada. Thereafter the defendant Rubenstein arranged for a fraudulent divorce from Sandler of Spitz, and objected to evidence thereof being introduced, upon the theory the conspiracy had terminated when Spitz entered the United States fraudulently. No defendant attacked the sufficiency of the evidence to prove the conspiracy with respect to the one entry.

Thus while it is true both these cases "deal with a conspiracy," they do not aid the government to establish that the facts herein prove a single, rather than six separate conspiracies. We conclude the government here proved six conspiracies, not one.

"We do not think that either Congress, when it enacted § 269, or this Court when deciding the Berger case [Berger v. United States, 295 U.S. 78, 79, 55 S.Ct. 629, 79 L.Ed. 1314] intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." Kotteakos v. United States,

supra, 328 U.S. at page 773, 66 S.Ct. at page 1252.

▆ The variance between proof of several separate conspiracies when one has been charged is prejudicial to the defendants. United States v. Russano, supra; Poliafico v. United States, supra.[7] And see Canella v. United States, 9 Cir., 1946, 157 F.2d 470, at page 476, wherein the court said:

"The theory of the trial court here and of the trial court in the Kotteakos case, was that all the evidence relating to all the separate spokes in the wheel was admissible against McCormac and Wyckoff and was relevant to the charge of a single conspiracy because of the general rule that when one joins an existing conspiracy, he 'takes it over as it is' and becomes liable for all that has gone before or may happen later. However, 'to bring this rule into operation it is not enough that, when one joins with another in a criminal venture, he knows that his confederate is engaged in other criminal undertakings with other persons, even though they be of the same general nature. The acts and declarations of confederates, past or future, are never competent against a party except in so far as they are steps in furtherance of a purpose common to him and them. Declarations * * become competent only when they are uttered in order to accomplish a common purpose.' See note 7.

"The view taken at the trial here, as in the trial of Kotteakos v. United States, (see note 7) 'confuses the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character.' "

▆ The judgment of conviction as to Count I (conspiracy) is reversed as to each appellant. The judgment of conviction as to each appellant on the respective substantive counts is affirmed. The matter is remanded for appropriate action in accordance herewith.

---

**7.** And see: Brooks v. United States, 5 Cir., 1947, 164 F.2d 142; Daily v. United States, 9 Cir., 1960, 282 F.2d 818, at pages 821–822.