**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Noble C. BEASLEY and James H.**
**Finley, Defendants-Appellants.**

**No. 74–1339.**

United States Court of Appeals,
Fifth Circuit.

May 23, 1975.

---

Ralph Kennamer, Mobile, Ala. (Court appointed), for Beasley.

Vernon Z. Crawford, Mobile, Ala., Jonathan Shapiro, Boston, Mass., for Finley.

C. S. White-Spunner, U. S. Atty., Irwin W. Coleman, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

Before GOLDBERG and RONEY, Circuit Judges, and GROOMS, District Judge.

GROOMS, District Judge:

Appellants, Finley and Beasley, were indicted with Walter C. Clewis and Maynard H. Williams for conspiring to interfere with interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.[1] The jury found appellants guilty but acquitted Clewis and Williams. The indictment alleges that between April 15, 1970, and February 15, 1973, that each of the appellants conspired with the co-defendants to extort monies from the promoters, agents, employees, or artists of eight named shows. Defendants were alleged to have attempted to obtain the payment of such monies for "imposed, unwanted, [and] superfluous services" of a corporation known as Soul Productions, Inc., by the use of "actual and threatened force and fear of economic loss by means of boycotting, picketing of said shows and obstruction of radio advertising and ticket sales outlets and destruction of advertising placards."

Appellants assign an array of errors, including the (1) sufficiency of the indictment, (2) sufficiency of the evidence, (3) action of the court in permitting the

---

1. "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

government to question the defendant Clewis on cross-examination about statements he had allegedly made prior to the trial and after the conclusion of the alleged conspiracy to agents of the Internal Revenue Service, and in permitting the agents to testify about such statements in rebuttal, (4) refusal of the court to grant a severance to Appellant Finley, (5) admission of prejudicial evidence, and (6) giving of erroneous and prejudicial instructions to the jury.

We will consider first, alleged errors (3) and (5) as noted.

2. In response to Clewis' initial denial that Finley and Beasley had approached him and wanted five percent commission on all black shows in the Mobile Municipal Auditorium, Brannan testified:

"A He [Clewis] stated that Finley and Beasley had approached him and wanted five percent commissions on all black shows in the Municipal Auditorium.

. . . . .

"A He said he told them that Soul Productions existed being Mr. Finley and Mr. Beasley and Mr. Williams, and these people wanted five percent, and if they were not paid the show would be boycotted by the black people, no advertising would be conducted in any of the black businesses and that any posters put up by other than this organization would be torn down."
On further cross, Clewis testified:

"Q All right sir. Now, at that time, on February 22nd, did you tell Agent Coats there that Mr. Beasley informed you that he wanted to get in the production business?
A Yes sir, he did.
Q Now, did you tell him that, 'later on in 1969 James H. 'Doc' Finley phoned him'—that's you—'phoned and told you that he and Beasley had their own productions company, Soul Productions, Incorporated, and they wanted five percent of the gross take on every black show that came to Mobile, Alabama?' . . .
Well, did they tell you that they wanted five percent of the gross take on every black show?
A That they promoted?
Q Yes sir.
A That they promoted or worked with. Yes sir. But that's normal throughout the country."

. . . . .

"Q I am asking did you tell the agents that Mr. Finley told you that he would guarantee that no posters or billboards would be torn down and no blacks would boycott or demonstrate at the auditorium.

The record reveals more than one instance, on cross of Clewis and on rebuttal of agents Brannan and Coats, where extrajudicial statements were admitted without limitation to Clewis at the time of their admission.[2]

In a lengthy in chambers conference there was a line-by-line consideration of five memoranda of interviews by the agent with Clewis and objections to the court's permitting the cross-examination of Clewis respecting the same. The court ruled that they could be used for cross-examination purposes and, reserv-

A Where they put the placcards and things. Yes sir.
Q Sir?
A Where they put their placcards and all, yes sir, they would not be torn down where they put their placcards.
Q Where they put their placcards?
A Yes sir.
Q Where they put their placcards?
A Yes sir.
Q What about a boycott and demonstration, did they say there would be no demonstrations?
A They never told me nothin about demonstrations. Since I think of October '70 I never heard that word."
In rebuttal Coats testified:
"A Finley further stated that they could guarantee no posters or billboards would be torn down and no blacks would demonstrate or boycott the auditorium.
Q Now, the last paragraph on that first page, do you see that, sir?
A Yes sir.
Q Did Mr. Clewis tell you that?
A Yes sir."
On further cross Clewis testified:
"Q Did you further tell those agents that on that same day in that same interview that Mr. Finley told you or stated that they could guarantee no posters or billboards would be torn down and that no blacks would demonstrate or boycott the auditorium?
A Yes sir."
In further rebuttal Coats testified:
"A Clewis stated that it was along about this time that Beasley informed him that he wanted to get in the promotion business. Shortly after this in 1969 James H. 'Doc' Finley phoned him and told him that he and Beasley had their own productions company, Soul Productions, Incorporated, and that they wanted at least five percent of the gross take on every black show that came to Mobile, Alabama."

ing to the defendants a continuing objection, overruled the objections stating that "it will be a question for the jury whether or not they will believe the inferences and statements that are made." There was no motion to limit the evidence to the impeachment of Clewis and no limitation was placed on its use prior to or at the time of its admission.

In its final charge the court admonished the jury as to statements and acts not done during the continuance and in furtherance of a conspiracy, and charged that:

"Otherwise, any admission or incriminatory statement made or act done outside of Court by one person may not be considered as evidence against that person who was not present or any person who was not present and did not hear the statement made or see the act done. *Therefore, as I say, statements of any conspirator which are not in furtherance of the conspiracy, or were made before the conspiracy came into being, or after it was terminated, maybe considered as evidence only as against the person making it. . . .* " [Emphasis supplied]

It did not specifically address itself to the statements here involved. Appellants concede that the charge stated the law, but contend that the instruction was too little and came too late.

Among the authorities cited to sustain the contentions so urged are Lutwak v. United States, 344 U.S. 604, 618–619, 73 S.Ct. 481, 97 L.Ed. 593; and United States v. Apollo, 5 Cir., 476 F.2d 156, 163. In *Lutwak,* the court carefully distinguished between *acts* which took place after the conspiracy ended which were relevant and *declarations* of a co-conspirator not in furtherance of the conspiracy. As to the latter the court ruled:

"In the trial of a criminal case for conspiracy, it is inevitable that there shall be, as there was in this case, evidence as to declarations that is admissible as against all of the alleged conspirators; there are also other declarations admissible only as to the declarant and those present who by their silence or other conduct assent to the truth of the declaration. *These declarations must be carefully and clearly limited by the court at the time of their admission and the jury instructed as to such declarations and the limitations put upon them.* Even then, in most instances of a conspiracy trial of several persons together, the application of the rule places a heavy burden upon the jurors to keep in mind the admission of certain declarations and to whom they have been restricted and in some instances for what specific purpose." [Emphasis supplied]

The court, nevertheless, affirmed as harmless error, since it could find only one instance of such a declaration and there was overwhelming evidence of the defendants' guilt.

Analyzing that ruling in *Apollo,* and the effect of a hearsay charge given at the conclusion of the trial, we said:

"*Lutwak* established a minimum obligation on the trial judge in a conspiracy case in which extrajudicial statements of alleged co-conspirators are proffered to give a cautionary instruction on the limited uses of hearsay testimony, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it must be established by independent non-hearsay evidence which must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony. See Menendez v. United States, 393 F.2d 312 (5th Cir. 1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 572 (1969).

.     .     .     .     .

"The Government calls our attention to the charge given by the court at the conclusion of the trial. While it does contain an accurate statement of the role of hearsay evidence in conspiracy cases, it came too late. This delicately dangerous defusing must be firmly in the jury's minds when the hearsay is proffered. An instruction at the end of the trial cannot correct the errone-

ous refusal to give the proper cautionary instruction when it was first requested."

In *Apollo* there was a request for limiting instructions.

In Upham v. United States, 5 Cir., 328 F.2d 661, after the prosecuting witness had testified differently from what she had previously indicated in a written statement, an F.B.I. agent who took the statement identified it, and it was offered and received as evidence. We noted the absence of a request to limit the evidence to impeachment and ruled:

"It was received without limitations on the purpose for which it could be considered and without objection. It was an extremely damaging statement. While appellant's counsel did not request an instruction that the statement be considered only as impeaching the witness, the need for such a charge to the jury was so obvious and the failure to give it so prejudicial to the appellant that this Court must notice the failure as '[p]lain errors * * affecting substantial rights' of the accused under Rule 52(b) F.R.Crim. Proc."

In United States v. Lipscomb, 6 Cir., 425 F.2d 226, where prior inconsistent oral statements of the witness made to a government agent were admitted, no specific cautionary instruction was requested or given. The court citing *Upham,* among other authorities, held:

"We are of the opinion that the failure of the trial judge to limit through cautionary instructions the jury's consideration of these extra-judicial statements to impeachment purposes requires reversal. Although such an instruction was not specifically requested, it has generally been held that failure to give it amounts to plain error where, as here, the government's case is weak and the statement is extremely damaging. Jones v. United States, 128 U.S.App.D.C. 36, 385 F.2d 296 (1967); Newman v. United States, 331 F.2d 968 (8th Cir. 1964); Upham v.

United States, 328 F.2d 661 (5th Cir. 1964)."

Although there was enough nonhearsay evidence in this record to support a conviction, such evidence was not overwhelming, as in *Lutwak,* nor so narrowly restricted in the number of statements.

■ The court erred in failing to limit the effect of the hearsay evidence to the impeachment of Clewis in conformity with the rules prescribed in *Lutwak* and *Apollo.*

■■ On February 7, 1973, defendant Clewis, who was the manager of the Mobile Auditorium wrote Don Fox of Beaver Productions in New Orleans and enclosed copies of a contract covering the *Curtis Mayfield* Concert. Fox replied on the 9th and stated that after talking to Mr. Lambert on the phone they had decided to cancel the concert, giving as a reason therefor that there was a group of black people in Mobile who were asking 10–15% to promote the *Curtis Mayfield* show, and that if they did not cooperate those people would picket the show. Also, after talking with Ricky Williams he (Williams) had informed them that the black preachers would boycott the show because it was on Sunday night. During the testimony of witness Lambert, Assistant Manager of the Auditorium, the letter of the 9th of February was offered and received in evidence without limitation and over objections timely made. It was not a business record within the purview of 28 U.S.C. § 1732, was damaging hearsay as to appellants, and was erroneously admitted as to them. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645; Hussein v. Isthmian Lines, Inc., 5 Cir., 405 F.2d 946; United States v. Shiver, 5 Cir., 414 F.2d 461; United States v. Sherfey, 6 Cir., 384 F.2d 786.

During his cross-examination Clewis offered in evidence and the court admitted the complete record of the minutes of the meetings of the Auditorium Board of Directors. The minutes contain Clewis' reports to the Board and contain

extremely damaging hearsay statements as to Beasley and incidentally as to Finley because of his association with Beasley. In the minutes of March 5, 1969, it is stated that: "James Brown (of the James Brown Show) told Mr. Clewis by phone that he would rather not be a part of what seemed to be the threat of a major riot, as Beasley and his group were extreme militants." From the minutes of February 17, 1971, we quote: "When I returned from the International Promoters Association meeting in New York, it was rumored that blacks were blackmailing promoters of black shows and asking a percentage to be paid to black promoters or they would boycott the building.—I was told if they did not have a black promoter here for this show there would be a boycott so I informed the promoters what I had been told—Mr. Kinsaul said he was told by Dickey Diamond if they did not hire a black promoter, they would be boycotted."

■ The fact that the statements of Clewis were included in his reports to the Board did not make them admissible for the truth of what was stated. Their mere recordation imported no guaranty of their truth.

The court in United States v. Burruss, 4 Cir., 418 F.2d 677, referring to the purpose of the Business Record Act, said:

"The act was not designed, however, to facilitate the introduction of hearsay as to which the reporter, if he appeared in person, would not be allowed to testify. The police officer who made the report would not have been permitted to tell what the owner of the car told him, for the purpose of establishing the truth of the owner's statement. Similarly, if the testimony is reduced to record form it continues to be inadmissible."

The court erred in admitting the minutes. United States v. Shiver, *supra*; United States v. Graham, 6 Cir., 391 F.2d 439. See also, Yates v. Bair Transport, Inc. (S.D.N.Y.) 249 F.Supp. 681, where there is an extensive review of the authorities.

We are again presented with the charge held to be error in Mann v. United States, 5 Cir., 319 F.2d 404, 409,[3] cert. den., 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474. *Mann* has been followed, distinguished, explained and qualified. In view of the posture of the case at this point, we deem it unnecessary to further analyze that case or the decisions directed to it. Upon a retrial the court will not overlook our language in United States v. Wilkinson, 5 Cir., 460 F.2d 725, 734, wherein we ruled:

"We hold today that the use of the *Estes'* [Estes v. United States, 335 F.2d 609 (5th Cir. 1964), cert. denied 380 U.S. 926, 85 S.Ct. 884, 13 L.Ed.2d 814] 'rebuttable presumption' language and *Mann's* 'So unless the contrary appears' language, should be discontinued; and where the nature of the case and the remaining portions of the charge do not alleviate the problem created, convictions based upon verdicts returned by juries so instructed will not be allowed to stand."

■ Finley's written motion for a severance was based upon his joinder with Beasley. His brief deals with his joinder with Clewis. Clewis will not be a defendant upon a retrial. But in view of a possible reassignment of the motion as to a joinder with Beasley, we deem it well to observe that severance is a matter committed to the sound discretion of the trial judge. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101; Tillman v. United States, 5 Cir., 406 F.2d 930, 934–935, cert. den. 395 U.S.

---

**3.** "As a general rule it is reasonable to infer that a person ordinarily intends all of the natural and probable consequences of acts knowingly done or knowingly omitted. So, unless the evidence in this case leads you to a different or contrary conclusion, you may draw the inference and find that the accused intended all of the natural and probable consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to have resulted from any acts knowingly done or knowingly omitted by him."

830, 89 S.Ct. 2143, 23 L.Ed.2d 742. We find no abuse of the court's discretion in denying the motion.

The other alleged errors referred to herein, and others referred to in the briefs, are without merit.

The case is reversed for a new trial as to both appellants.

Reversed.