**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edward L. JENNINGS, a/k/a Biggum Jennings, Robert Louis Hawkins and Bobby Gene Younger, Defendants-Appellants.**

No. 74–4230.

United States Court of Appeals,
Fifth Circuit.

Feb. 26, 1976.

---

J. Dwayne Wilcox, Euless, Tex. (Court appointed), for Jennings.

Emmett Colvin, Dallas, Tex., for Hawkins.

Roland H. Hill, Jr., Ft. Worth, Tex. (Court appointed), for Younger.

Frank D. McCown, U. S. Atty., Alex H. McGlinchey, Asst. U. S. Atty., Ft. Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GEWIN, BELL and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

Edward L. Jennings, Robert Louis Hawkins, and Bobby Gene Younger appeal from their convictions on drug trafficking charges. A seven-count indictment charged each appellant with one count of conspiracy to possess with intent to distribute and conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition, Jennings and Hawkins were charged with distribution of ten grams of heroin, and Younger with possession with intent to distribute ten grams of heroin, in violation of·21 U.S.C. § 841(a)(1). The grand jury also indicted William Charles "Popsie" Curtis on the conspiracy count and various substantive counts. Curtis had not been apprehended at the time of appellants' trial, but he figures prominently in the facts of the case.[1] Following a

jury trial, a verdict of guilty was returned against each appellant on each count against him. All sentences imposed were to be served concurrently and were less than the maximum penalty. This appeal followed.

Appellants raise several points on appeal: (1) the admission without limiting instructions of co-conspirator hearsay testimony prior to proof of the existence of the conspiracy; (2) the admission of hearsay testimony concerning acts and statements allegedly not in furtherance of the conspiracy charged; (3) comments by government counsel during the summation and closing statement; and (4) sufficiency of the evidence. We have carefully reviewed the record of the case and considered the contentions of the parties in their briefs and on oral argument. The convictions are affirmed.

I

Testimony concerning the appellants' involvement in the alleged conspiracy and substantive offenses centered on a drug sale occurring on May 10, 1974. The prosecution's principal witness was Harold Reed, an informant. Except as to certain important events at which only Reed and one or more of the defendants were present, Reed's testimony was corroborated by Drug Enforcement Administration (DEA) agents Eddie Brown and Charles Mathis, who were involved in the transaction in an undercover capacity. We must, of course, examine the facts in the light most favorable to the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 86 L.Ed. 680, 62 S.Ct. 457 (1941).

On May 9, 1974, Reed and DEA agents Mathis and Brown had a fortuitous meeting with Popsie Curtis, the fugitive co-defendant, in Fort Worth, Texas. Curtis stated that he had a good heroin connection in Dallas and that he and another man were going there the next

---

1. Curtis was subsequently apprehended, tried and convicted. His conviction was affirmed on appeal. *See United States v. Curtis,* 524 F.2d 238 (5th Cir. 1975). Jennings and Hawkins were each charged in Count 1, the conspiracy count, and Count 6, a substantive count. Younger was charged in Count 1 and Count 7, a substantive count. Counts 2, 3, 4, and 5 contained substantive charges against Curtis.

day to make a purchase. Curtis advised Reed and agent Mathis that they could buy heroin from the same source, and they all arranged to meet the following day in a small shopping center in Dallas. On May 10, both Reed and Mathis telephoned Curtis to confirm the appointment; Curtis told Reed that if he (Curtis) was late arriving, the men should check with "Hawk" in a shoeshine parlor in the shopping center.

Reed, Mathis, and Brown arrived at the appointed time; after waiting several minutes for Curtis, Reed entered the shoeshine parlor. Upon asking for "Hawk", Reed was directed to appellant Hawkins, who told him that Curtis had not arrived. Reed returned to the car and waited with Mathis and Brown until Curtis appeared in a car driven by appellant Younger. Curtis greeted the agents and then excused himself to talk to his "man",[2] whereupon he and Younger conversed with a group that included Hawkins and two other men. After a brief discussion, Curtis returned, told Reed and the agents that he and Younger planned to purchase $600 worth of heroin, and asked them how much they were prepared to spend. Brown indicated that they would pay $800 for an ounce of the drug, so Curtis returned to tell "the man" what they wanted. While Curtis talked with Hawkins and the two other men, Younger directed Reed and the agents to a billiards parlor in the shopping center.

Reed left the agents in the car and entered the King's Room, a private area adjacent to the billiards parlor, where he observed Curtis "snorting" or inhaling a white powder; Younger, appellant Jennings, and an unidentified man were also present. Reed asked Curtis how long it would take to "score and split," i. e., buy the drugs and leave, and Curtis assured him that it would take only a few minutes. At this point, Curtis and Reed left the billiards parlor. Curtis met with Hawkins, who then drove away. In re-

sponse to the agents' query, Curtis told them that his "man" had left and would return shortly with the heroin, at which point Reed and the agents left on a pretext and returned to the DEA office for the purchase money.

Reed and agent Brown returned to the billiards parlor later that afternoon. Brown remained in the car while Reed entered the King's Room, where he found Curtis, Younger, Jennings, and an unidentified man. Curtis informed Reed that the drugs had not arrived yet. Reed then stated that he and Brown would not pay more than $500 without a sample of the heroin. Reed and Curtis went outside to discuss the matter of price with Brown, who reiterated Reed's statement. Reed and Curtis returned to the King's Room, and when Reed commented upon the delay, Jennings stated that if Curtis had come directly to him (Jennings), the purchase could have been completed already. Jennings tried unsuccessfully to locate Hawkins by telephone, and then offered to procure a sample for Reed. Jennings and Younger left in Younger's car, and returned within one-half hour with a sample of the heroin, which Younger handed to Curtis and which Curtis, Jennings, Younger, and Reed all tested by "snorting."

Subsequently, Hawkins returned to the billiards parlor, was greeted by Curtis, and the two of them went inside. A few minutes later, Curtis came out to the car and told Brown and Reed, "The man is here, give me the bread." Brown asked to meet Curtis's source, but Curtis refused to introduce them. Hawkins then came out of the pool hall, summoned Curtis, and whispered something to him, whereupon Curtis told Brown to give Reed the money for the heroin, which was done; Reed passed the money to Curtis, and they went inside.

Reed, Curtis, and the appellants entered what Reed described as a back room off the King's Room. Younger gave Hawkins an unspecified amount of

---

2. DEA agent Brown testified that the term "my man" as used in the Dallas-Fort Worth area refers to one's source of supply for drugs.

money, and Curtis gave Hawkins agent Brown's money, which Hawkins counted and pocketed. Hawkins then produced a red balloon and Younger asked for a test "snort." Jennings provided a knife, the balloon was cut, and Curtis and Younger each inhaled some of the powder from the balloon.

Jennings suggested that they go to his house to divide the narcotics, and Jennings, Curtis, and Younger, followed by Reed and Brown, drove to a residence about a mile away. Brown remained outside while the others entered the house. Jennings handed Curtis the balloon and a record album cover, upon which Curtis spread and divided the heroin. Curtis gave Brown his portion in a yellow balloon while Younger packaged the remaining heroin.

Reed also testified, over objection, to other conversations and transactions involving Curtis, and, in some instances, agent Mathis.

The defense called one witness, Donald Walker, appellant Hawkins's half-brother and an employee at the billiards parlor, which Hawkins owned. Walker denied that Reed had ever entered the King's Room on the day in question, and testified that the room in which Reed claimed the sale occurred, and which Reed had been unable to describe beyond the characterization "back room," was in fact a small restroom with the usual fixtures, and clearly marked as such.

## II

We address first the appellants' contention that they were denied a fair trial by the court's refusal to exclude extrajudicial acts and declarations of co-conspirators prior to establishment by independent evidence of the existence of a conspiracy and the defendants' participation therein, or in the alternative to give a cautionary instruction upon the admission of such testimony. The appellants made a clear and complete objection on these grounds upon the first instance of such hearsay testimony, and renewed it at several points throughout the trial; each time, the objection was overruled.

■ Courts have recognized the discretion of trial judges to control the order of proof, and in conspiracy trials the court may admit hearsay acts and statements of alleged co-conspirators subject to later proof by independent evidence of the existence of the conspiracy and the defendant's connection therewith. *E. g., United States v. Apollo*, 476 F.2d 156, 163 (5th Cir. 1973); *Nelson v. United States*, 415 F.2d 483, 487 (5th Cir. 1969), *cert. denied*, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970). We therefore direct our attention to the court's refusal to give a cautionary instruction.

■ The hearsay testimony admitted against appellants included acts and declarations admissible only under the co-conspirator exception to the hearsay rule, such as Curtis's conversations with Reed and the agents, and therefore dependent on proof *aliunde* of the conspiracy and the defendants' involvement.[3] Also included was testimony that was admissible without meeting the requirements of the co-conspirator exception, but only against the declarant and, in proper circumstances, those present when the statement was made or the act done;[4] this latter type of evidence, however, could be considered against all defendants, including those not present, once the requisites of the co-conspirator exception were met. The court admitted both types of extrajudicial acts and statements without cautioning the jury as to the limitations on their use at the

---

3. *E. g., Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680, 701 (1942); *United States v. Apollo*, 476 F.2d 156, 163 (5th Cir. 1973). There are further limitations on the admissibility of such evidence under this exception. The acts or statements must have been made in furtherance of the conspiracy and during its pendency. *E. g., United States*

*v. Martinez*, 481 F.2d 214, 220 (5th Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974); 2 C. Wright, Federal Practice and Procedure § 413 at 153–56 (1969).

4. *See, e. g., Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); 2 C. Wright, Federal Practice and Procedure § 413 at 148–50 (1969).

time the evidence was admitted. Such instructions were given in the court's charge at the time the case was submitted to the jury and there is no objection to the charge as given.

In *Lutwak v. United States,* 344 U.S. 604, 618–19, 73 S.Ct. 481, 490, 97 L.Ed. 593, 604 (1953), the Supreme Court instructed:

In the trial of a criminal case for conspiracy, it is inevitable that there shall be, as there was in this case, evidence as to declarations that is admissible as against all of the alleged conspirators; there are also other declarations admissible only as to the declarant and those present who by their silence or other conduct assent to the truth of the declaration. *These declarations must be carefully and clearly limited by the court at the time of their admission and the jury instructed as to such declarations and the limitations put upon them.* Even then, . . . the application of the rule places a heavy burden upon the jurors to keep in mind the admission of certain declarations and to whom they have been restricted and in some instances for what specific purpose. (emphasis added)

*See, e. g., United States v. Beasley,* 513 F.2d 309 (5th Cir. 1975); *United States v. Nelson,* 498 F.2d 1247 (5th Cir. 1974); *Upham v. United States,* 328 F.2d 661 (5th Cir. 1964); *cf. United States v. Gomez-Rojas,* 507 F.2d 1213, 1223 (5th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

This court, in *United States v. Apollo,* 476 F.2d 156, 163 (5th Cir. 1973), interpreted *Lutwak* as follows:

*Lutwak* establishes a *minimum obligation* on the trial judge in a conspiracy case in which extrajudicial statements of alleged co-conspirators are proffered to give a cautionary instruction on the limited uses of hearsay testimo-

ny, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it must be established by independent non-hearsay evidence which *must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony.*

. . . [T]he unmistakable hazard of allowing [hearsay testimony prior to proof *aliunde* of the conspiracy] highlights the need for the court to condition the minds of the jurors so that they will not fail to remember that none of this hearsay will bootstrap the necessary establishment of the conspiracy itself by firsthand proof. (emphasis added)

The *Apollo* court found under the facts and in the circumstances of that case that an instruction at the conclusion of the trial, however accurate, was insufficient. The *Apollo* rule has been consistently followed by this court, *see, e. g., United States v. Beasley,* 513 F.2d 309, 313 (5th Cir. 1975); *United States v. Nelson,* 498 F.2d 1247, 1249 (5th Cir. 1974), and specifically adopted by at least one other circuit, *United States v. Honneus,* 508 F.2d 566, 577 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975).[5]

As the preceding authorities demonstrate, the trial judge erred in failing to give the requested cautionary instruction. The court is acutely aware of the "heavy burden" upon jurors in conspiracy trials and of the "unmistakable hazard" that a flood of hearsay testimony may obscure the issues and the individual identities of the defendants, with the resulting possibility of verdicts based on guilt by association. Where a trial court has refused to employ the required measures designed to insulate the minds of the jurors against this possibility, this court must carefully scrutinize the

---

**5.** In *United States v. Moore,* 505 F.2d 620 (5th Cir. 1974), *cert. denied,* 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975) and *United States v. Jimenez,* 496 F.2d 288, 291 (5th Cir. 1974),

this court refused to reverse for failure to give *Apollo* instructions when no timely request had been made.

record to determine whether substantial rights of the defendants were thereby affected. 28 U.S.C. § 2111; Rule 52(a), F.R.Crim.P. Justice Rutledge's classic formulation of the proper standard in *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67 (1946), must direct our determination:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . .. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

This assessment necessarily turns on the facts and circumstances of each case, *United States v. Ratner,* 464 F.2d 169 (5th Cir. 1972), and must be made in light of the admonition that "an appellate court should be slow to assume that an error in the trial was inconsequential." *DeLuna v. United States,* 308 F.2d 140, 155 (5th Cir. 1962).

**6.** Another difference between this case and *Apollo* is the fact that in *Apollo* the defendants were given maximum consecutive sentences. Here, the appellants were given less than the maximum sentences and they are to run concurrently.

**7.** *Accord United States v. Rodriguez,* 524 F.2d 485, 487 (5th Cir. 1975) ("To require a new trial, the prejudicial effect . . . must not be overwhelmed by evidence of guilt"), *quoting United States v. Arenas-Granada,* 487 F.2d 858, 859 (5th Cir. 1973); 3 C. Wright, Federal Practice and Procedure § 854 at 358 (1969) ("Perhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant").

Considering, then, the record in its entirety, we are left with the firm conviction that the trial court's refusal to give the requested instruction was harmless error. In *Apollo,* where we held that the same type of error required reversal, the government's case was weak, and "the court permitted a veritable flood of . . . hearsay testimony." 476 F.2d at 163.[6] Courts have long recognized that "an error that might have been prejudicial in a close case does not require reversal when the evidence of the defendant's guilt is strong." *United States v. Lipscomb,* 435 F.2d 795, 803 (5th Cir. 1970) *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971).[7] Here, the case against appellants was far from weak. We cite only a few of the facts proved against each defendant: Hawkins procured the heroin, accepted payment for it, and distributed it to the others; Jennings claimed that he could have consummated the sale more quickly than Hawkins, he obtained a sample of the drug, provided his house for the division of the heroin, and handed Curtis the narcotics for division and delivery to the agents; Younger drove Curtis to the scene of the sale, directed the agents to the billiards parlor, accompanied Jennings to obtain the sample, handed the sample to Curtis, and participated in the division of the heroin. The events that support the conclusion that appellants were members of the conspiracy occurred in fairly rapid succession and over a relatively short period of time. That evidence was clear and direct as well as circumstantial.[8]

**8.** In *United States v. Moore,* 505 F.2d 620, 624 (5th Cir. 1974), this court, speaking through Judge Ainsworth, noted that the evidence in *Apollo* was "skimpy," and stated:

> It would seem to be harmless error, if error at all, for a court to fail to limit a jury's consideration of hearsay testimony when the evidence *aliunde* strongly indicates both the existence of a conspiracy and a defendant's participation therein. In such circumstances, the jury may impute acts and statements to coconspirators without restriction, and a cautionary instruction turns out to be a meaningless gesture. (footnote omitted)

On this record, we cannot find that the failure to give cautionary instructions influenced the jury or prejudiced the defendants. Co-conspirator hearsay statements were admissible against all defendants subject to later proof by independent evidence of the existence of the conspiracy and the defendants' participation therein. It is axiomatic that the government need not prove a formal agreement to violate the law; the existence of a conspiracy may be proved circumstantially. *E. g., United States v. Lowry,* 456 F.2d 341, 344 (5th Cir. 1972); *United States v. Warner,* 441 F.2d 821, 830 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Once a defendant has been connected with the conspiracy through his own conduct, all acts and statements of his co-conspirators during the pendency and in furtherance of the conspiracy are admissible against him. The record clearly shows that the government carried its burden of proving the existence of the conspiracy, and the acts and statements of each defendant were more than sufficient to establish his involvement in the conspiracy and his commission of the substantive offense charged. On these facts, the absence of an instruction conditioning the consideration against all defendants of co-conspirator acts and declarations upon subsequent proof of the conspiracy and the defendants' participation therein could not have prejudiced the defendants, as the requisites for admission of this testimony without restrictions were met.

In summary, the trial court's refusal to give the requested instruction was error, but on the facts of this case no substantial rights of the defendants were affected and the error was harmless beyond a reasonable doubt.

The foregoing discussion obviates any need to discuss at length the appellants' challenge to the sufficiency of the evidence. We find this contention to be without merit.

## III

The appellants' second contention is related to the first, but concerns specifically the admission of hearsay acts and statements of Curtis and one Jimmy Ray Smith, an unindicted co-conspirator. Reed related conversations and transactions prior and subsequent to May 10 in which the defendants were not shown to have been directly involved.[9] Appellants contend that this testimony concerned acts and statements that were not in furtherance of the conspiracy charged.

Examining first the appellants' objection to the extrajudicial statements of Jimmy Ray Smith, related by Reed, we find that these were not hearsay. Reed testified that Curtis was not at their appointed meeting place and that Smith "told us he [Curtis] was at home and he couldn't get to us because a friend of his had his car. . . ." This clearly was not offered to prove the truth of the matter stated—that Curtis was at home and had loaned his car to a friend—but merely to show that the statement was made. Moreover, the defense objected on grounds of non-responsiveness and giving a narrative answer, not on hearsay grounds. This point is without merit.

Appellants' challenge to other conversations and drug transactions with Curtis must also fail. This testimony was presented after the government had sufficiently established the existence of the conspiracy and the defendants' participation therein by independent evidence, and therefore it was admissible if the

---

**9.** Specifically, the challenged testimony concerned a March 24 conversation among Reed, Curtis, and Smith about a possible heroin purchase; an April 1 heroin sale by Curtis to Reed and agent Mathis; an April 11 conversation among Reed, Mathis and Smith regarding Curtis's whereabouts; a drug purchase by Reed and Mathis from Curtis (an unknown man was also present) on April 11; a May 1 conversation among Reed, Mathis and Curtis regarding a drug purchase; and a June 1 meeting between Reed and Curtis, after which Reed drove Curtis and an unknown man to the Dallas-Fort Worth Airport so that Curtis could purchase tickets to Detroit, where he stated he intended to buy heroin.

acts and statements of co-conspirator Curtis were made in furtherance and during the pendency of the conspiracy. All of the testimony concerned heroin transactions. The indictment charged a conspiracy running from on or about March 1, 1974, through on or about July 30, 1974. If the jury concluded that the conspiracy was formed prior to May 10, it was entitled to consider Curtis's earlier acts and statements against those defendants whom it found to be members of the conspiracy, whether or not they had joined it before May 10, as acts in furtherance of a single continuing conspiracy to distribute drugs to the agents. *United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746, 765 (1948).

■ Similarly, the jurors could consider the June 1 trip to the airport as an act in furtherance of a plan to make additional distributions to the agents. If it found that the conspiracy was still in existence at this point, the jury could consider this event as binding upon appellants, as none of them had manifested an intention to withdraw from the conspiracy. *See United States v. Rodriguez*, 509 F.2d 1342, 1347 (5th Cir. 1975). Appellants have not shown that the prejudicial impact of the evidence was so great as to outweigh its probative value. Established law compels the conclusion that it was properly admitted.

## IV

Appellants final contentions are directed toward the government attorneys' summation and closing statement. They charge that government counsel (1) argued as to a critical matter not in evidence and (2) commented upon the failure of the defendants to testify. The court overruled defense objections to the challenged portions of the statements.

■ Prior to the testimony of defense witness Walker, the question arose whether Walker had been present in the courtroom before being sworn, during a portion of Reed's testimony. Walker was the only defense witness, and he was called to rebut the testimony of Reed. Walker was questioned under oath, outside the presence of the jury, by the court and counsel. He stated that he had been present from about 12:05 p. m. until the noon recess at about 12:20 p. m.; Reed was testifying at the time, but Walker could recall nothing specific about the testimony.[10] Walker was then allowed to testify.

In closing argument, the government attorney stated, "Mr. Walker was in the courtroom for a short portion of Mr. Reed's testimony, though . . . Mr. Walker in the afternoon doesn't come back in the courtroom any more." Appellants' contention that this constituted a comment on a matter not in evidence is unfounded. Before the jury, on direct examination of Walker, defense counsel elicited the fact that Walker had been present in the courtroom for ten or fifteen minutes, that he had seen Reed, and that he had not returned after the noon recess. Moreover, when the prosecutor's remarks are considered in their entirety, it is clear that they were not designed to imply that Walker had listened to Reed and then concocted a contrary story. Rather, they were merely an attempt to suggest that Walker had been called to testify as part of a desperate, last-minute maneuver by the defense. The court did not err in overruling the objection.[11]

■ In his summation, government counsel noted that Reed's description of the interior of Jennings's house had not been contradicted.[12] Appellants assert

---

10. Reed's testimony during the relevant time did not touch upon anything in Walker's testimony.

11. Appellants' argument that the prosecutor's comments falsely represented that Walker was present in the courtroom during a portion of the morning, when in fact he did not arrive

until 12:05 p. m., and that this somehow prejudiced them, is frivolous.

12. The prosecutor's statement was: "Jumping next, Ladies and Gentlemen, to inside Biggum Jennings' house—you know sometimes it's the little things in a lawsuit that show up, Ladies and Gentlemen, but you will recall that Mr.

that this observation constituted a comment upon the defendants'· failure to testify, because aside from Reed, only Jennings, Curtis, and Younger were present in Jennings's house when the heroin was divided.

While it is improper to comment upon the failure of a defendant to take the stand, it is well established that one may point out that the testimony of witnesses is uncontradicted, *Davis v. United States,* 357 F.2d 438, 441 (5th Cir.), *cert. denied,* 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966), particularly where someone other than the defendant could have offered contrary evidence, *Garcia v. United States,* 315 F.2d 133, 137 (5th Cir. 1963), *cert. denied,* 375 U.S. 855, 84 S.Ct. 117, 11 L.Ed.2d 82 (1963). The test we must apply is "whether or not the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of · the accused to testify." *United States v. Wilson,* 500 F.2d 715, 721 (5th Cir. 1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975). The comment challenged here was not such a statement. Evidence impeaching Reed's description of Jennings's house could have been developed on cross-examination of Reed, or by the testimony of anyone familiar with the interior of the house. Thus, there is no basis for concluding that the prosecutor "manifestly intended" the remark to be a comment on the defendants' failure to testify, or that the jury so understood it. Moreover, the court in its charge repeatedly instructed the jury that the defendants were under no obligation to testify, and that no inference could be drawn from their failure to do so.[13] The court properly overruled the objection.

We have considered all of appellants' contentions and find no reversible error.

Affirmed.

Reed told you how the inside of that house looked and that has not been contradicted to this point. That Biggum Jennings got out a record album cover—" At this point, defense counsel objected.

**13.** If the court had noted in its charge that government evidence was undisputed, there would be reversible error. *United States v. Hall,* 525 F.2d 1254 (5th Cir. 1976).