UNITED STATES of America,
Plaintiff-Appellee,

v.

Andre Willis KING, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Fred Neil POWELL, Defendant-Appellant.

Nos. 75–2424, 75–2934.

United States Court of Appeals,
Ninth Circuit.

Dec. 16, 1976.

Certiorari Denied April 18, 1977.
See 97 S.Ct. 1646.

Marcus S. Topel (argued), San Francisco, Cal., for defendant-appellant (in 75–2424).

Billie A. Rosen, Atty. (argued), Crim. Div., Dept. of Justice, Washington, D.C., James J. McLaughlin, Atty. (argued), Crim. Div., Dept. of Justice, Washington, D.C., Dennis Michael Nerney, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before BARNES, CHOY and KENNEDY, Circuit Judges.

CHOY, Circuit Judge:

Andre Willis King and Fred Neil Powell appeal from multiple-count convictions for conspiracy to commit and for the commission of narcotics offenses. We affirm.

## BACKGROUND

King and Powell were indicted with two others, Kearney and Lemon, in an eight-count indictment charging various violations of 21 U.S.C. §§ 841(a), 846, 959, and 963. In particular, King was charged with conspiracy to import heroin illegally into the United States and to possess and distribute heroin (Count One) and with unlawful distribution of heroin intended for importation into the United States (Counts Three and Four). Powell was charged with conspiracy (Count One), with unlawful distribution of heroin intended for importation into the United States (Counts Three, Four, and Five), and with distribution of heroin (Count Eight). The indictment accused King, Powell, Kearney, and Lemon, as well as several unindicted co-conspirators, of engaging in a scheme to obtain heroin in Thailand, transport it through military cargo channels to Japan, and reship the heroin in a variety of ways from Japan to the United States for ultimate unlawful sale and distribution. Further detailed description of the activities and the evidence will be referred to where specifically relevant to issues on appeal.

Jury trial commenced in the district court on April 28, 1975. After a two and one-half week trial, Powell was convicted of Count Eight and Lemon was convicted of three counts. After three days of deliberation, the jury was unable to reach a verdict as to the other counts and defendants. As to those, a mistrial was declared, and a second jury trial commenced two days later. The second jury found King and Powell guilty as to all remaining counts.[1]

Between them, King and Powell raise six issues. Numbers one through five apply to

King and are discussed in his brief. Powell's brief adds a sixth, and Powell also adopts by reference the arguments presented in King's brief as to numbers one and five.

## ISSUES

1. Was the district court's admission into evidence of the depositions of two absent witnesses erroneous as a denial of King's and Powell's rights of confrontation, effective assistance of counsel, and due process?

2. Did the district court err in denying King's motion for severance?

3. Did the district court err in refusing King's request for a cautionary instruction during the trial regarding the admissibility of statements under the co-conspirator exception to the hearsay rule?

4. Did the district court abuse its discretion in rereading a portion of a witness' testimony to the jury?

5. Are the convictions of King and Powell for violating 21 U.S.C. § 959 (unlawful manufacture or distribution of a controlled substance for purposes of unlawful importation) unconstitutional since Congress' legislative authority does not properly reach their activity outside the United States?

6. Was the evidence insufficient to support Powell's conviction on Count Eight?

## DISCUSSION

A. *Use of Deposition Testimony under 18 U.S.C. § 3503*

A key component of the Government's case rested on the testimony of two unindicted co-conspirators, Adams and Gamble. They were not available to testify at trial since both were serving terms of imprisonment at Yokosuka Prison in Japan for Japanese narcotics law offenses.[2] The Government thus submitted their testimony in the form of videotaped depositions with a stenographic transcript.

---

1. Kearney was acquitted on one count; the others were found guilty on all counts.

2. Subpoenas were served upon Adams and Gamble at Yokosuka Prison in Japan, but the

The depositions were taken pursuant to 18 U.S.C. § 3503, adopted in 1970.[3] Section 3503(a) provides that a court may order testimony for a criminal action to be taken by deposition "[w]henever due to exceptional circumstances it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved,"

prison warden would not permit the deponents to travel to the United States to honor the subpoenas.

3. The statute provides in full:

§ 3503. Depositions to preserve testimony

(a) Whenever due to exceptional circumstances it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved, the court at any time after the filing of an indictment or information may upon motion of such party and notice to the parties order that the testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place. If a witness is committed for failure to give bail to appear to testify at a trial or hearing, the court on written motion of the witness and upon notice to the parties may direct that his deposition be taken. After the deposition has been subscribed the court may discharge the witness. A motion by the Government to obtain an order under this section shall contain certification by the Attorney General or his designee that the legal proceeding is against a person who is be-- lieved to have participated in an organized criminal activity.

(b) The party at whose instance a deposition is to be taken shall give to every party reasonable written notice of the time and place for taking the deposition. The notice shall state the name and address of each person to be examined. On motion of a party upon whom the notice is served, the court for cause shown may extend or shorten the time or change the place for taking the deposition. The officer having custody of a defendant shall be notified of the time and place set for the examination, and shall produce him at the examination and keep him in the presence of the witness during the examination. A defendant not in custody shall have the right to be present at the examination, but his failure, absent good cause shown, to appear after notice and tender of expenses shall constitute a waiver of that right and of any objection to the taking and use of the deposition based upon that right.

(c) If a defendant is without counsel, the court shall advise him of his rights and assign counsel to represent him unless the defendant elects to proceed without counsel or is able to obtain counsel of his own choice. Whenever a deposition is taken at the instance of the Government, or whenever a deposition is taken at the instance of a de- fendant who appears to be unable to bear the expense of the taking of the deposition, the court may direct that the expenses of travel and subsistence of the defendant and his attorney for attendance at the examination shall be paid by the Government. In such event the marshal shall make payment accordingly.

(d) A deposition shall be taken and filed in the manner provided in civil actions, provided that (1) in no event shall a deposition be taken of a party defendant without his consent, and (2) the scope of examination and cross-examination shall be such as would be allowed in the trial itself. On request or waiver by the defendant the court may direct that a deposition be taken on written interrogatories in the manner provided in civil actions. Such request shall constitute a waiver of any objection to the taking and use of the deposition based upon its being so taken.

(e) The Government shall make available to the defendant for his examination and use at the taking of the deposition any statement of the witness being deposed which is in the possession of the Government and which the Government would be required to make available to the defendant if the witness were testifying at the trial.

(f) At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears: That the witness is dead; or that the witness is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition; or that the witness is unable to attend or testify because of sickness or infirmity; or that the witness refuses in the trial or hearing to testify concerning the subject of the deposition or part offered; or that the party offering the deposition has been unable to procure the attendance of the witness by subpena. Any depositions may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness. If only a part of a deposition is offered in evidence by a party, an adverse party may require him to offer all of it which is relevant to the part offered and any party may offer other parts.

(g) Objections to receiving in evidence a deposition or part thereof may be made as provided in civil actions.

*See also* Fed.R.Crim.P. 15 (depositions).

and subsection (f) permits the use of such a deposition at trial if, among other reasons, "the witness is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition . . . ." The district court admitted the depositions into evidence on this basis. The statute also provides, in subsection (b), that

> [a] defendant not in custody shall have the right to be present at the examination, but his failure, absent good cause shown, to appear after notice and tender of expenses shall constitute a waiver of that right and of any objection to the taking and use of the deposition based upon that right.

Under subsection (d), the scope of examination and cross-examination allowed is as broad as would be allowed at trial itself, and the deposition is taken and filed as in civil actions. See Fed.R.Civ.P. 28, 30.

The depositions were set at Yokosuka Prison, and defendants (then on bail) and their attorneys traveled to Japan to participate at Government expense. The Japanese government was uneasy about the entire project, however, and it imposed several restrictions. It required that the defendants arrive together no earlier than January 20, 1975, and that the depositions begin the next day, though defense counsel protested that more time was needed to investigate and prepare for cross-examination. Defendants were taken from the airport to rooms prepared for them and were guarded throughout their entire stay. They were confined to their rooms except for the trips to the prison for the deposition sessions, and they were not allowed to telephone or otherwise communicate with anyone else in Japan. They and their rooms were frequently searched. They could confer with their attorneys initially only in their own rooms, but subsequently in counsels' rooms as well. There were also rooms set aside for consultation purposes at the prison. The defendants and their attorneys could not speak privately with the deponents prior to their examinations, and a rigid daily schedule was set for the depositions.

Defense counsel vigorously objected to these conditions, and American consular officials attempted to have them relaxed, but the Japanese government would not relent. Claiming that the circumstances were intolerable, defendants and their counsel withdrew on the fourth day during the Adams deposition and returned to the United States. The Government continued under the restrictions, taking the remainder of Adams' deposition and all of Gamble's after the defense's departure.

Back before the district court, the defendants moved to exclude the depositions. The motions were denied. The deposition videotapes were played to the jury in both trials with all constitutional objections made at the time of taking deleted. The court prohibited defense counsel from commenting to the jury either on the circumstances of the depositions or on the absence of cross-examination of Gamble. Nor were they allowed to raise evidentiary objections to questions in Gamble's testimony, their failure to appear and assert them at the deposition being taken as a waiver.

Appellants here raise three objections: (1) that the use of deposition testimony of witnesses absent at trial, as authorized by § 3503, is unconstitutional on its face; (2) that such use in the circumstances of this case is unconstitutional; and (3) that their departure from the deposition was not an effective waiver.

1. Facial Constitutionality of 18 U.S.C. § 3503

Appellants argue that the Supreme Court has never expressly authorized, for sixth amendment confrontation purposes, the use of an absent witness' deposition in lieu of trial testimony. While that may be true, the Court has observed that, at least since Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), "prior-recorded testimony has been admissible in appropriate cases." Mancusi v. Stubbs, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972). Instances where such evidence has withstood sixth amendment scrutiny include testimony given at an earlier trial

(*see, e. g., Mancusi, supra*) or at a preliminary hearing (*see, e. g., California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)) where the defendant was represented by counsel who had the opportunity to conduct an effective cross-examination.[4]

We consider here a federal statute entitled to a strong presumption of constitutionality. *See United States v. Watson*, 423 U.S. 411, 416, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), *quoting United States v. Di Re*, 332 U.S. 581, 585, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Two other circuits have considered the confrontation question in the context of § 3503, and both have rejected constitutional challenges to the use at trial of such depositions. *United States v. Ricketson*, 498 F.2d 367 (7th Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974); *United States v. Singleton*, 460 F.2d 1148 (2d Cir. 1972), *cert. denied*, 410 U.S. 984, 93 S.Ct. 1506, 36 L.Ed.2d 180 (1973). *See also United States v. Carter*, 493 F.2d 704 (2d Cir. 1974). We agree with these holdings.

In *Mancusi*, the Court characterized its concern under the confrontation clause as being

> to insure that there "are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant," *Dutton v. Evans*, [400 U.S. 74, 89, 91

S.Ct. 210, 27 L.Ed.2d 213 (1970)], and to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement," *California v. Green*, [399 U.S.] at 161, 90 S.Ct. [1930] at 1936.

408 U.S. at 213, 92 S.Ct. at 2313. Confrontation meets the need for adequate reliability and evaluation in that it

> (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (citation omitted). In *Green*, testimony given at the defendant's preliminary hearing was admitted under § 1235 of the California Evidence Code as substantive evidence at trial. The evidence was held to satisfy the protection of interests guaranteed by the confrontation clause because the prior-recorded testimony was given under oath, defendant was represented by counsel—indeed, the same counsel who later represented him at trial—and was able to cross-ex-

---

4. Dying declarations have also long been admissible without offending confrontation principles, this even despite the lack of cross-examination. *See, e. g., Mattox, supra. See also* Fed.R.Evid. 804(b)(2) (statement under belief of impending death).

In his scholarly concurrence to *Green*, Justice Harlan analyzed the then extant confrontation opinions of the Supreme Court. *Green*, 399 U.S. at 172–89, 90 S.Ct. 1930. After a review of the common law antecedents to the constitutional confrontation doctrine, Justice Harlan concluded that underlying the operative principle of the right of confrontation was an *availability* rule, "one that requires the production of a witness when he is available to testify." *Id.* at 182, 90 S.Ct. at 1948. This harmonization of the holdings explained both the dying declaration exception and the refusal to except prior recorded testimony when the witness is still available to testify. *Id.* at 182–83, 90 S.Ct.

1930. *Compare id.* at 162, 90 S.Ct. 1930 (opinion of the court). He cited *West v. Louisiana*, 194 U.S. 258, 24 S.Ct. 650, 48 L.Ed. 965 (1904), as one of the opinions which both justified his rationale and "anchored it in precedent." In *West*, the Court considered the use of deposition testimony at trial. The issue, however, was whether the there instant state procedures complied with the due process command of the fourteenth amendment. The sixth amendment question was not specifically dealt with, though the admission of the testimony was affirmed. The *West* opinion emphasized availability of the witness as the unifying link in the earlier federal precedents, rather than cross-examination.

In *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the Supreme Court held the sixth amendment right of confrontation applicable to the states by virtue of the fourteenth amendment.

amine the witness, and the proceedings were conducted before a judicial tribunal equipped to provide a record of the hearing. *Id.* at 165, 90 S.Ct. 1930.

The *Green* Court regarded the testimony as admissible "wholly apart from the question of whether [the defendant] had an effective opportunity for confrontation at the subsequent trial."[5] *Id.* The Court reasoned that, though a preliminary hearing is "ordinarily a less searching exploration into the merits of a case than a trial," *id.* at 166, 90 S.Ct. at 1939, had the declarant been unavailable at trial without state connivance, the confrontation clause would not have been offended by admission of the hearsay testimony. The right of cross-examination afforded at the earlier hearing provided "substantial compliance with the purposes behind the confrontation requirement . . . ." *Id.* *See Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

█ We think the *Green* rationale controls the resolution of the present issue. A deposition taken under § 3503 satisfies the procedural safeguards required by the confrontation clause.[6] The section by its terms is limited to "exceptional circumstances" where, in the interest of justice, it is necessary to take and preserve testimony away from the trial court.[7] 18 U.S.C. § 3503(a). Use of the testimony at trial as substantive proof is permitted only if it appears that the witness meets one of several "unavailability" criteria.[8] The section incorporates

provisions of the Federal Rules of Civil Procedure to govern criminal depositions. Federal Rule of Civil Procedure 30(c) requires an authorized person to put the deponent on oath. Defendants have the right to be present during the deposition and to be represented by counsel. 18 U.S.C. § 3503(c). The scope of examination is as would be allowed at full trial. *Id.* The rules permit depositions taken in foreign countries before persons authorized either by the law thereof or of the United States, Fed.R.Civ.P. 28(b), and require the recording of the testimony, *id.* 30(c). The entire procedure is under the authority and general supervision of the trial court. Finally, depositions generally expose the deponent to rigorous cross-examination on all issues, rather than on the limited question of probable cause as in the *Green* preliminary hearing.

The Supreme Court has emphasized that "the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' " *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970), *quoting Green,* 399 U.S. at 161, 90 S.Ct. 1930. We believe that the procedures for depositions taken and admitted at trial pursuant to § 3503 provide the trier of fact with a satisfactory basis for truth evaluation consistent with both accurate truth determination and practical considerations for the administration of jus-

---

5. This language has been labeled mere dicta, and it has been criticized. *See United States v. Singleton,* 460 F.2d 1148, 1155–59 (2d Cir. 1972) (Oakes, J., dissenting), *cert. denied,* 410 U.S. 984, 93 S.Ct. 1506, 36 L.Ed.2d 180 (1973); 8 J. Moore, Moore's Federal Practice ¶ 15.02[3], at 15–27 & n.40 (2d ed. 1976). But while the *Ricketson* court considered the language "at best an alternative holding," 498 F.2d at 374, as a separate subdivision of a majority opinion, we agree with the *Ricketson* panel that we are not at liberty to depart from its import.

6. We limit our scrutiny to the provisions of § 3503 employed to authorize the depositions in the instant case. We therefore intimate no opinion with respect to provisions not relevant herein.

7. Motions by the Government to obtain a deposition order under § 3503 must contain certification by the Attorney General or his designee that the instant proceeding is against someone believed to have participated in organized criminal activity. 18 U.S.C. § 3503(a).

8. These include the witness' death, absence from the United States (unless the absence was procured by the party offering the deposition), sickness or infirmity, refusal to testify at trial with respect to the deposition's subject or part offered thereof, or the inability of the offering party to procure attendance by subpoena. 18 U.S.C. § 3503(f).

tice. Accordingly, we hold that the statute is not facially unconstitutional.

2. Unconstitutionality of 18 U.S.C. § 3503 As Applied

Appellants also argue that there were constitutional defects in the particulars of these depositions. Specifically, they allege: that the deponents were under no effective oath and were without fear of a potential perjury prosecution; that the videotape presentation of the deponents' testimony was inadequate to let the jury observe the demeanor of the witnesses; and that the "oppressive, intimidating, and frightening" conditions at the deposition proceedings in Japan constituted a denial of effective cross-examination, representation of counsel, and due process.

■ a. *The Oath.* Appellants argue that no valid oath was administered to the deponents, so that they could "lie with impunity." We disagree. Both deponents were sworn in by First Secretary and Consul of the United States Embassy, Tokyo, Japan, who presided as hearing officer. Secretaries of embassy and consular officers are authorized to administer oaths and take depositions. 22 U.S.C. § 1203. *See also* 22 C.F.R. §§ 92.4, 92.49 *et seq.*; Consular Convention and Protocol of March 23, 1963 between the United States of America and Japan, [1964] 1 U.S.T. 768, 795 (permitting consular officers to take depositions on behalf of the sending state). Section 3503 incorporates the federal rules governing civil depositions, 18 U.S.C. § 3503(d), which, in turn, permit depositions taken before persons authorized to administer oaths in the place where the examination is held. Fed.R.Civ.P. 28(b)(1).

The commission of perjury when under oath in a deposition taken, as here, before a secretary of embassy or consular officer is punishable "in the same manner, in all respects, as if the offense had been committed in the United States . . . ." 22 U.S.C. § 1203. The federal perjury and false declaration statutes also specifically apply to extraterritorial testimony under oath where authorized, as here, for the proceedings. 18 U.S.C. §§ 1621, 1623. We conclude that the deponents were validly under oath and subject to the penalties for perjury.

■ b. *Videotape and Demeanor Evidence.* Appellants urge that the admission of the deposition evidence was in any case erroneous because the use of videotape testimony cannot provide an adequate opportunity to observe demeanor. We think this argument misses the focus of the *Green* analysis. It is true that a photographic or electronic presentation is not a perfect substitute for live testimony on the witness stand. But confrontation does not require perfect presentation and availability of demeanor evidence to the trier of fact; the loss of some demeanor evidence that would have been relevant to resolving questions of credibility does not violate confrontation rights. 399 U.S. at 160, 90 S.Ct. 1930.

Appellants further argue that videotape presentation is also defective because the picture portrays only the witness and not counsel. Constitutional interests are served, however, by a somewhat narrower scope of vision. The Court reasoned in *Green* that one of the objectives of confrontation is to permit the jury deciding a defendant's fate "to observe the demeanor of the *witness* in making his statement, thus aiding the jury in assessing his credibility." *Id.* at 158, 90 S.Ct. at 1935 (emphasis added).

Finally, we note that evidence presented in the form of a stenographic transcript and a videotape cannot be any less helpful in enabling a jury to assess credibility than a bare transcript alone, read by the prosecutor. *See, e. g., Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).

c. *Deposition Proceedings.* Appellants contend that the circumstances surrounding the instant depositions were sufficiently restrictive and oppressive so as to deny them effective cross-examination, representation by counsel, and due process. As the factual basis for this claim, appellants marshal a series of events which they allege coalesced to deprive them of constitutional protections. While the situation may not have

been ideal, the defects do not approach constitutional dimension.

■ Appellants present a generous list of alleged harassments impeding the conduct of their investigation while in Japan. At the outset (though appellants argue that the point is irrelevant), we note that none of the conditions imposed upon appellants and counsel were at the behest of the United States Government. Neither the unavailability of the witnesses, nor the conditions in Japan, were instigated with state connivance. There is no suggestion of active prosecutorial misconduct or even passive acquiescence in covertly welcomed developments.[9] *Cf. Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Indeed, counsel for the Government operated under identical restraints.[10]

■ Appellants strongly complain that they were denied adequate time while in Japan to investigate the case. The Government paid for the travel expenses for the defendants and their attorneys to attend the depositions, as the court was permitted to order under § 3503(c). Aside from complying with that discretionary court order, the Government had no statutory or constitutional responsibility to finance the preparation of the defense. Appellants' counsel had adequate time prior to the depositions to mount an investigation.[11] While the *appellants'* time in Japan and mobility once there were restricted by the Japanese government, there were no restrictions placed on *counsel's* freedom to travel or look into all aspects of the charges and deponents' backgrounds. Even within the United States, there is no constitutional right for defendants in custody to be freed to aid in pretrial investigation efforts.

Appellants complain of an inability to confer with their counsel in sufficient privacy because the conference rooms at Yokosuka Prison and the hotel suites had been secured by Japanese authorities, and because they were under continuous guard. Aside from the admittedly tight security measures already noted, however, the record reveals no allegation of specific facts to buttress appellants' fears of electronic eavesdropping. *Cf. United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973); *Cohen v. United States*, 378 F.2d 751 (9th Cir. 1967).

Appellants insist that a prerequisite to admissibility lacking in deposition testimony is the ambience of solemnity closely approximating a trial. *Cf. California v. Green*, 399 U.S. 149, 165, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970) (Court noted that the admitted preliminary hearing testimony was "given under circumstances closely approximating those that surround the typical trial"). While the source of appellants' "solemnity" requirement is somewhat unclear, we think that the instant deposition complied with that requirement in meeting the specific interests enumerated in *Green* : the witnesses were under oath; defendants were represented by counsel with the opportunity for cross-examination; and the

---

9. Through State Department channels, the Government attempted to have certain conditions removed or relaxed. Those finally insisted upon were imposed by the Japanese government in the protection of its own interests and those of its citizens as it deemed necessary.

*Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), which held that a trial court order preventing a defendant in a federal criminal prosecution from consulting with his counsel during an overnight trial recess worked a deprivation of the sixth amendment right to counsel, is inapposite. The Court specifically limited its scrutiny to the trial context and did "not reach, and [did] not deal with limitations imposed in other circumstances." *Id.* at 91, 96 S.Ct. at 1337.

10. That the Japanese government was justified in considering the limitations as necessary security measures is beyond the review function of this Court. We note, however, that appellant Powell was a convicted felon in Japan and appellant King had been arrested there for possession of 34 grams of heroin. The Japanese officials were particularly concerned with the flow of illegal narcotics traffic through their country. This background places the admittedly restrictive procedures into contextual perspective.

11. The Government's motion to take the depositions was granted in November 1974 and all of the deponents' prior statements in the possession of and known to the Government were turned over to the defense on or about November 22, 1974.

proceedings were before an authorized hearing officer who was equipped to take and preserve the testimony. *See id.* The entire record was then under the supervision and control of a United States District Judge. 18 U.S.C. § 3503(f); Fed.R.Civ.P. 30(c). We further note that the deponents were under an oath they believed to be valid and they agreed to be cross-examined by a battery of experienced counsel. The physical context of the prison with the security personnel present would surely contribute to "impressing [the deponents] with the seriousness of the matter and guar[d] against the lie . . . ." *Green*, 399 U.S. at 158, 90 S.Ct. at 1935.

In attacking the deposition circumstances as fundamentally limiting defense counsel's ability to conduct a cross-examination, appellants have misconstrued *Green*. Appellants cite the observation in *Green* that cross-examination at the prior preliminary hearing there in issue did "not appear to have been significantly limited in any way . . . ." *Id.* at 166, 90 S.Ct. at 1939. As part of the same sentence, however, the Court made clear that the focus of its scrutiny was on the possible limitation of the scope or nature of cross-examination. We find no indication that cross-examination was limited in the *Green* sense. Indeed, deposition cross-examination is potentially broader and more revealing for purposes of discovery than trial testimony because the hearing officer merely records objections for later ruling by the court; the deponent is permitted to answer subject to later striking. Fed.R.Civ.P. 30(c).

Appellants cite the inability to recall deponents as further undercutting appellants' due process and representation rights. This reasoning is premised on an alleged total inability to communicate with counsel. Appellants' analysis is faulty for two reasons. It first assumes that the failure to take advantage of available opportunities for conference would be vindicated upon our reviewing their fears of surveillance. We have rejected that premise. It second assumes incorrectly that inability to recall renders the initial testimony infirm. The

deponents were subject to cross- and re-cross-examination "as would be allowed in the trial itself." 18 U.S.C. § 3503(d). Courts have upheld admission of prior testimony where the witness was not subject to recall. *See, e. g., Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *United States v. Ricketson*, 498 F.2d 367 (7th Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 227, 48 L.Ed.2d 180 (1974) (section 3503 deposition).

Other problems cited by appellants occur in the context of any deposition, within or without the United States. Appellants complain of an inability to interview the deponents prior to the examination, yet such an interview is not an absolute right; the choice to speak to defense counsel is the witness' alone. Appellants decry the failure of congruence between the deponents' prior statements and their deposition testimony. The fleshing out of prior statements with hitherto unknown detail is the essence of deposition testimony; that the elaboration occurred at Yokosuka Prison should not detract from its admissibility. We think the obstacles to investigation were not significantly greater than if the witnesses had been available to testify in the United States.

■ We are cognizant of the procedural difficulties faced by the district court in managing a multiple-count, multiple-defendant trial, magnified by arranging for a deposition to be taken on foreign soil. This case involved several factual questions with respect to the exact nature of the proceedings in Japan during the deposition sojourn. In reviewing such questions of fact (even where arguably mixed with law), this circuit has adhered to the "clearly erroneous" rule. *United States v. Hart*, 546 F.2d 798 (9th Cir. 1976) (en banc). We are unable to say that the district judge was clearly erroneous in concluding what the circumstances were, and we think that they complied with constitutional demands.

3. Waiver

■ During the cross-examination of deponent Adams, the first of the two witness-

es, appellants and their counsel refused to participate further in the deposition proceedings. They were not present at all during the Gamble deposition. This decision was based upon an alleged inability to cross-examine the deponents because of the restrictive security measures imposed by the Japanese. Appellants insist that this conduct cannot constitute an effective waiver of their objections to the taking and use of the deposition testimony under § 3503. We disagree, and uphold the district court's ruling that appellants' actions in departing from the depositions worked a waiver.

The major long-standing Supreme Court authority on waiver of fundamental rights is *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938): "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Id.* at 464, 58 S.Ct. at 1023. The determination of whether a right (in *Johnson,* the sixth amendment right to counsel) had been intelligently waived must depend upon a survey of the particular facts and circumstances surrounding the individual case. *Id.*

By absenting themselves from the proceedings, by failing to avail themselves of the opportunity to cross-examine the Government witnesses, even if under less than perfect conditions, the appellants intentionally and knowingly gave up both the right to be present and to object to future use of the testimony. It was a calculated act, undertaken with knowledge of the potential consequences. Appellants argue, however, that they gave up no *existing* rights since alleged constitutional defects emasculated the rights in any event. Since we have already found the exercise of those rights not to have been unconstitutionally infringed upon, the waiver was effective.

Section 3503 itself supports this result. It provides that "failure, absent good cause shown, to appear after notice and tender of expenses shall constitute a waiver of [the] right [to be present] and of any objection to the taking and use of the deposition based upon that right." 18 U.S.C. § 3503(b). Since appellants can offer no reason for their absence other than the alleged harassments which we have found not to be constitutionally infirm, they have not shown "good cause" and have waived objections to the further taking and use of deponents' testimony.[12]

### B. *Severance*

Prior to his first trial, King moved for severance of the parties and counts pursuant to Federal Rules of Criminal Procedure 12 and 14. The district court denied both this motion and subsequent motions for acquittal. King claims that the denial of his Rule 14 severance motion violated his rights to a fair trial and confrontation under the sixth amendment.[13] He bases this claim on the admission of the Adams and Gamble depositions, which contained statements allegedly made by co-defendant Powell implicating King in the charged criminal activities. The statements were admitted as coconspirator exceptions to the hearsay rule. The depositions themselves were admitted under 18 U.S.C. § 3503.

Powell, as a criminal defendant, could refuse to take the stand at the joint trial, U.S.Const. amend. V., and King could not compel his testimony or comment on its absence. *United States v. De La Cruz Bellinger,* 422 F.2d 723 (9th Cir.), *cert. denied,* 398 U.S. 942, 90 S.Ct. 1860, 26 L.Ed.2d 278 (1970). *See* 18 U.S.C. § 3481; *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). King claims he was therefore denied an opportunity by cross-

---

12. The legislative history casts some light on the application of the waiver provision: "The test of waiver is intended to be the same as for waiver of presence at trial. Voluntary absence from trial constitutes such waiver." [1970] U.S.Code Cong. & Ad.News 4007, 4025. *See*

*Taylor v. United States,* 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973).

13. King does not now challenge the denial of his motion for severance as an abuse of discretion.

examination to confront the witness against him, Powell.[14]

■ The issue before us is whether the confrontation clause was violated by admitting out-of-court declarations under the coconspirator exception to the hearsay rule. We hold that it was not.

■ The primary concern of our inquiry must be to determine, "whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration." *United States v. Adams,* 446 F.2d 681, 683 (9th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971). In making this determination, we note that the confrontation clause may be violated by an extra-judicial statement which is admitted as an exception to the hearsay rule. *United States v. Snow,* 521 F.2d 730, 734 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976); *United States v. Baxter,* 492 F.2d 150, 177 (9th Cir.), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *Adams,* 446 F.2d at 683.[15]

As construed by this Court in *Snow,* in *Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Supreme Court enumerated several criteria which there indicated whether the requisite "satisfactory basis" for the jury's determination is present:

(1) [T]he declaration contained no assertion of a past fact, and consequently carried a warning to the jury against giving it undue weight; (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying upon faulty recollection was remote; and (4) the circumstances under which the statements were made did not provide reason to believe that the declar-

ant had misrepresented the defendant's involvement in the crime.

521 F.2d at 734. We find that Powell's statements satisfy all of these criteria. In each instance, Powell was speaking of his then current dealings with King. Powell had knowledge of King and his role in those activities. Since Powell was speaking of current dealings, there is little possibility he was relying on faulty recollection. The circumstances were such that it is not likely that Powell would lie to Adams and Gamble, since he had no reason to anticipate their future testimony for the Government.

There is language in the decisions indicating that other factors may be involved in determining the admissibility of extra-judicial statements under the confrontation clause. *Dutton,* 400 U.S. at 87, 91 S.Ct. 210; *Snow,* 521 F.2d at 735–36. First among these is whether or not the introduction of the statement will have a " 'crucial' or 'devastating' " effect. In view of the large amount of other evidence substantiating King's activities as described by Powell, we do not regard Powell's statements as crucial or devastating. It is true that the bulk of this evidence is circumstantial, but such evidence is weighed on the same scale and laid before the jury in the same manner as direct evidence. *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Nelson,* 419 F.2d 1237, 1240–41 (9th Cir. 1969). Of the other factors mentioned in *Dutton,* use of a coerced confession, prosecutorial misconduct, use of a paper transcript, and the wholesale denial of cross-examination were not present in the instant case.

The final factor mentioned, the effects of a joint trial, is particularly relevant here in that this portion of the appeal is based on the contention that one of those effects— the absence of King's ability to cross-examine Powell—violated King's rights under the confrontation clause. In *Dutton,* the

---

14. King did have the opportunity to cross-examine the two deponents, Adams and Gamble, in Japan. Powell is the declarant of some of the extrajudicial statements testified to at the deposition.

15. We have expressly reaffirmed the rule of *Baxter* that "admissib[ility] under the co-conspirator exception does not automatically demonstrate compliance with the Confrontation Clause." *Snow,* 521 F.2d at 734 & n.2.

Supreme Court did discuss three cases involving the potential for denial of cross-examination of a co-defendant inherent in a joint trial. 400 U.S. at 83–87, 91 S.Ct. 210. Those cases, however, all focused on confessions by one co-defendant implicating the other, which were absolutely inadmissible as against the implicated co-defendant. *Roberts v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1965). *See also Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Here, we deal with statements which would normally be admissible against the implicated co-defendant, King, under a valid hearsay exception.[16]

We have already considered whether the confrontation clause was violated by the instant use of the co-conspirator hearsay exception, and we have held that it was not. The confrontation clause does not absolutely require cross-examination, but rather safeguards of reliability. We think those safeguards were present here.

Furthermore, it is not clear that severance would have had any beneficial effect for King. His counsel has only alleged, based on King's own assertion of innocence, that Powell would testify in his favor. From the information before us, it seems as conceivable that Powell would refuse to testify pending his appeal, or would even further implicate King, as that he would exculpate King or deny his earlier declarations.

The denial of the motion for severance is affirmed.

## C. Curative Instruction

Some of the evidence against King was admitted under the co-conspirator exception to the hearsay rule.[17] For such evidence to be admitted, the Government had to establish by independent evidence a prima facie case that the conspiracy which forms the basis of the exception in fact existed. *United States v. Spanos,* 462 F.2d 1012, 1014 (9th Cir. 1972); *Carbo v. United States,* 314 F.2d 718, 737 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). *See Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). King argues here that the district court erred in failing to give a requested cautionary jury instruction at the time the evidence was offered that extra-judicial declarations of one co-conspirator implicating another should not be considered against the other person unless independent, nonhearsay evidence establishes the existence of the conspiracy and his participation in it, beyond a reasonable doubt. The court instead reserved the instruction for the end of trial.[18]

The Government argues that all objections to use of the co-conspirator's state-

**16.** Since we have held that the evidence here was not crucial or devastating, we need not comment on the strength of the dicta in *Dutton* and *Snow* indicating that if evidence is crucial or devastating, it could be absolutely barred from admission on confrontation clause grounds. No holding of any case brought to our attention has turned on the application of this standard. However, it is possible to read the Supreme Court's dictum in *Dutton* as casting a quantitative analysis into the context of several factors: *i. e.,* coerced confession, prosecutorial misconduct, paper transcript, denial of cross-examination, and joint trial. Thus, whether evidence is crucial or devastating may not be determinable in the abstract—as an independent factor—as the dictum in *Snow* may suggest. Rather, " 'crucial' or 'devastating' " may be a standard against which evidence from one of the several contexts is compared, the admission of which, if below the threshold, would be harmless error. *Compare Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) *with* Fed.R.Crim.P. 52(a).

**17.** Appellants' trial took place in April 1975, when the Federal Rules of Evidence were not yet in effect. Rule 801(d)(2)(E) classifies statements made by co-conspirators in the furtherance of the conspiracy as nonhearsay.

**18.** Apparently, at the second trial, just after the jury had been empaneled, the court offered to read all the instructions as to conspiracy. The defense objected, however, because the court did not offer to read *only* the curative instruction requested at the first trial, or all the instructions concerning, for example, the burden of proof. The instructions were then subsequently included in the jury charge.

ments testified to at the deposition were waived by appellant's absence therefrom, citing 18 U.S.C. § 3503(b) and *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The co-conspirator exception was not invoked only as to the testimony of deponents Adams and Gamble, however; the cautionary instruction was requested as to the testimony of witnesses present at trial. Moreover, King may have raised hearsay objections while present during the first part of the Adams deposition. Under § 3503(b), King waived objections to the taking and use of the deposition only to the extent that such objections depended on his right to be present. Thus the waiver may not be broad enough to eliminate King's objections.

King cites as persuasive authority—and urges this Court to adopt—the Fifth Circuit rule of *United States v. Apollo,* 476 F.2d 156 (5th Cir. 1973), which recognizes

> a minimum obligation on the trial judge in a conspiracy case in which extrajudicial statements of alleged co-conspirators are proffered to give a cautionary instruction on the limited uses of hearsay testimony, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it must be established by independent nonhearsay evidence which must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony.

*Id.* at 163. *See also United States v. Jennings,* 527 F.2d 862 (5th Cir. 1976); *United States v. Beasley,* 513 F.2d 309 (5th Cir. 1975); *United States v. Nelson,* 498 F.2d 1247 (5th Cir. 1974); *United States v. Jimenez,* 496 F.2d 288 (5th Cir. 1974), *cert. denied,* 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975). The *Apollo* court relied substantially upon *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), as the source for the "minimum obligation" to give the curative instruction. In *Lutwak,* the Supreme Court stated:

In the trial of a criminal case for conspiracy, it is inevitable that there shall be, as there was in this case, evidence as to declarations that is admissible as against all of the alleged conspirators; there are also other declarations admissible only as to the declarant and those present who by their silence or other conduct assent to the truth of the declaration. These declarations must be carefully and clearly limited by the court at the time of their admission and the jury instructed as to such declarations and the limitations put upon them. Even then, in most instances of a conspiracy trial of several persons together, the application of the rule places a heavy burden upon the jurors to keep in mind the admission of certain declarations and to whom they have been restricted and in some instances for what specific purpose.

*Id.* at 618–19, 73 S.Ct. at 490.

The Government contends that the *Lutwak* language relied upon was mere dictum, and that, in any case, the Fifth Circuit has restricted the *Apollo* rule to cases of minimally sufficient showings of the conspiracy's existence. *See United States v. Moore,* 505 F.2d 620 (5th Cir. 1974), *cert. denied,* 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975). In cases where independent nonhearsay evidence strongly establishes the conspiracy, the *Moore* court held that the jury may impute "acts and statements to co-conspirators without restriction, and a cautionary instruction turns out to be a meaningless gesture." 505 F.2d at 624 (footnote omitted).

Both parties overlook our own circuit's analysis in *Carbo v. United States,* 314 F.2d 718 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964).[19] We reaffirm the reasoning of *Carbo.*

In conspiracy cases, the preliminary question of admissibility—the existence of the conspiracy and a defendant's participation in it—is often identical to an ultimate issue at trial. This coincidence in consideration of the conspiracy issue has led to confusion

19. *Carbo* was decided and the instant case was tried prior to the effective date of the Federal Rules of Evidence. For the present provisions, see Fed.R.Evid. 104 (preliminary questions).

with respect to whether the judge or jury is responsible for determining the existence of the conspiracy for purposes of admitting a co-conspirator's statements.

In *Carbo*, this Court addressed and resolved the issue. *Carbo* involved extortion affecting commerce and conspiracy to extort in violation of the Hobbs Act, 18 U.S.C. § 1951. When the Government offered statements by members of the conspiracy against other alleged co-conspirators, the defense argued that the preliminary question was to be resolved by the jury upon proof beyond a reasonable doubt. We reasoned then that, were the defense's argument correct, there would be no occasion to resort to the declarations; the evidence would not be considered unless the defendant's guilt had already been resolved. *Carbo*, 314 F.2d at 736, *citing United States v. Dennis*, 183 F.2d 201, 230–31 (2d Cir. 1950) (Hand, J.), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). We noted:

> To accept the problem as one of admissibility of evidence is to recognize that the declarations, if admissible, shall be considered by the jury *in reaching* its determination upon the issue of innocence or guilt. It will not do to tell the jury that it must reach its determination first.

*Id.* (emphasis in original). We also rejected giving the preliminary question to the jury to be decided by it upon the basis of a prima facie case rather than proof beyond a

reasonable doubt, reasoning that the compartmentalization of distinct evidence weighing standards (even if cautiously isolated by instructions) was an impractical—and potentially prejudicial—burden. We therefore adopted the view of function allocation between judge and jury which assigns to the judge questions of fact determinative of admissibility.

> It is for the judge then, and not the jury, to determine the admissibility of the declarations. In making this determination the test is not whether the defendants' connection had by independent evidence been proved beyond a reasonable doubt, but whether, accepting the independent evidence as credible, the judge is satisfied that a prima facie case (one which would support a finding) has been made. Thereafter it is the jury's function to determine whether the evidence, including the declarations, is credible and convincing beyond a reasonable doubt.

*Id.* at 737.

The instruction requested and refused by the district court in *Carbo*[20], *id.* at 735, was substantially similar to the instruction requested and *given* here.[21] We did not hold the failure to give the *Carbo* instruction to be error. Indeed, in adopting the "orthodox" view of allocating functions between judge and jury, we quoted with approval the following language from *Dennis:*

**20.** You will recall that testimony of acts and statements made by alleged co-conspirators in the absence of a defendant was received on a tentative basis in evidence. Such testimony was received subject to independent proof of the existence of the conspiracy and the absent defendant's knowing participation in the conspiracy. If you do not find, on independent proof, that a conspiracy existed and the absent defendant knowingly participated in the conspiracy, the tentative basis is destroyed and all such testimony must be ignored as to him.

A defendant's connection with a conspiracy must be established beyond a reasonable doubt, accordingly, by his own conduct and his own statements or declarations.

**21.** Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter

knowingly done, by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.

Otherwise, any admission or incriminatory statement made or act done outside of court, by one person, may not be considered as evidence against any person who was not present and did not hear the statement made, or see the act done.

Therefore, statements of any conspirator, which are not in furtherance of the conspiracy, or made before its existence, or after its termination, may be considered as evidence only against the person making them.

The law is indeed not wholly clear as to who must decide whether [a co-conspirator's] declaration may be used; but we think that the better doctrine is that the judge is always to decide, as concededly he generally must, any issues of fact on which the competence of evidence depends, and that, if he decides it to be competent, he is to leave it to the jury to use like any other evidence, without instructing them to consider it as proof only after they too have decided a preliminary issue which alone makes it competent.

314 F.2d at 737, *quoting Dennis,* 183 F.2d at 231.

■ We hold that the failure to give the requested instruction prior to the presentation of evidence perforce was not error.[22] To repeat such instructions several times in the course of trial would compound the fears of confusion recognized by Judge Hand in *Dennis* and this Court in *Carbo.* Indeed, appellant here may have benefited from the instruction received. Once the district judge made his prima facie determination, he nevertheless included in the final jury charge an instruction on the reasona-

ble doubt standard required preliminary to their consideration of co-conspirators' statements. If such instruction was error, it was harmless error.

■ Appellant's construction of *Lutwak,* incidentally, is also refuted by *Carbo.* When the *Lutwak* Court paused to observe that co-conspirators' declarations must be "carefully and clearly limited," it did so in the context of a declaration *not* in furtherance of the conspiracy, the introduction of which, by well-recognized doctrine, is absolutely limited to the declarant. *Carbo,* 314 F.2d at 738 n.26. In contrast, the introduction of a co-conspirator's declaration against a nondeclarant defendant made in furtherance of the conspiracy is only conditionally forbidden. Once the prosecution has established its prima facie case of conspiracy through independent nonhearsay evidence, the nondeclarant defendant is no longer shielded. It was the separate issue of who decides whether that threshold has been established that was before this Court in *Carbo.*[23]

D. *Rereading of Deposition Testimony*

In the second trial, after deliberating for some time, the jury requested a copy of the Gamble deposition. The court refused, for

**22.** We note that in the second trial, the district judge offered to read the requested instruction just after the jury was empaneled. *See* note 18 *supra.*

**23.** Our reaffirmance of *Carbo* on the preliminary question issue is further supported by the teachings of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), which was also based upon a concern for jury confusion. *Jackson* stands for the proposition that, in admitting confession evidence, the preliminary determination that the confession was voluntary must be fully and independently made by the judge before it may be presented to the jury. We think that the same principle of preliminary fact determination applies to the co-conspirator's declaration context, for we read *Jackson* as holding that the preliminary question must be resolved by the appropriate standard prior to admission. In our case, only the appropriate preliminary standard differs: at least by a preponderance of the evidence as to confessions, *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); prima facie showing as to co-conspirators' declarations. *But see* 1 J. Weinstein & M. Berger, Weinsten's Evidence ¶ 104[05], at 104–43 to –44 (1976).

In *Jackson,* the Court disapproved the "New York" rule of voluntariness, by which the trial judge made the preliminary determination regarding confessions offered by the prosecution. According to that rule, if under no circumstances could the confession be deemed voluntary, the evidence was excluded. But if the evidence presented a fair question (*e. g.,* where the facts were disputed or where reasonable persons could differ over inferences to be drawn from undisputed facts) the judge received the confession and left to the jury, under cautionary instruction, the determination both of voluntariness and truthfulness. The Court approved the "orthodox" rule, where the judge solely and finally determines the voluntariness of the confession. It also left undisturbed the "Massachusetts" rule, where the jury may assess voluntariness only after the judge has fully and independently resolved the question against the defendant. We have no need to comment on the "Massachusetts"-type rule which seems to govern the admission of co-conspirator's declarations in other circuits. *See United States v. Apollo,* 476 F.2d 156 (5th Cir. 1973), and its progeny.

fear of needlessly extending the deliberations. Over objections, the court did accede, however, to the jury's request that portions of the Gamble deposition relating largely to King's involvement in smuggling heroin into the United States be reread. Shortly thereafter, the jury returned with the guilty verdicts.

Both sides accurately state the standard on review to be abuse of discretion. *See United States v. Baxter,* 492 F.2d 150, 175 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). King argues, however, that singling out the reread testimony placed too much emphasis on it, with the rapidly ensuing verdicts as an indication of the prejudice.

Appellant King cites two cases in which the refusal to reread testimony was found not to have been an abuse of the trial court's discretion, both decisions noting a danger of overemphasis in rereading only portions of testimony. *Baxter, supra; United States v. De Palma,* 414 F.2d 394 (9th Cir. 1969), *cert. denied,* 396 U.S. 1046, 90 S.Ct. 697, 24 L.Ed.2d 690 (1970). This Court has also upheld the replaying of tape-recorded evidence two times during deliberation. *United States v. Puchi,* 441 F.2d 697 (9th Cir.), *cert. denied,* 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971). We have been directed to no case where this Court has found an abuse in either the granting or refusing of the request by the trial court, and we find no abuse here.

The Government argues that the segments reread constitute only a small part of the evidence against King. King replies (pointing to little else) that the speed with which the jury reached its verdict after hearing the testimony a second time attests to its overemphasis. We think that other conclusions not inconsistent with careful consideration of the evidence as a whole are possible. The jury may have already reached a verdict and merely desired a confirming clarification on one point; the clarification on a point may have been the "straw that broke the camel's back" in swaying a verdict properly based on the totality of the evidence.

 The discretion granted the trial judge is large, *De Palma, supra,* and determination of whether that discretion was abused must turn on the circumstances of the individual case. *Baxter, supra.* We cannot say that the trial judge abused his discretion.

### E. *Congress' Constitutional Authority under 21 U.S.C. § 959*

Appellants King (Counts Three and Four) and Powell (Counts Three, Four, and Five) were both convicted of unlawful distribution in Japan of heroin intended for importation into the United States in violation of 21 U.S.C. § 959.[24] Adopted in 1970, the statute is expressly aimed at having extraterritorial effect, but King and Powell protest that its attempted reach exceeds the legislative power vested in Congress by the Constitution.

 There is no constitutional bar to the extraterritorial application of penal laws. *Blackmer v. United States,* 284 U.S. 421, 436–38, 52 S.Ct. 252, 76 L.Ed. 375 (1932). Numerous decisions have upheld the authority of the United States to enact and enforce criminal laws with extraterritorial effect. *See, e. g., Blackmer, supra; United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922); *Strassheim v.*

24. The statute provides in full:

§ 959. Manufacture or distribution for purposes of unlawful importation

It shall be unlawful for any person to manufacture or distribute a controlled substance in schedule I or II—

 (1) intending that such substance will be unlawfully imported into the United States; or

 (2) knowing that such substance will be unlawfully imported into the United States.

This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia.

*Daily,* 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911); *United States v. Castillo-Felix,* 539 F.2d 9 (9th Cir. 1976); *United States v. Cotten,* 471 F.2d 744 (9th Cir.), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *Rocha v. United States,* 288 F.2d 545 (9th Cir. 1961). Appellants concede that the only court which has dealt with the constitutionality of § 959 has held it constitutional, *United States v. Daniszewski,* 380 F.Supp. 113 (E.D.N.Y.1974), but they question the reasoning underlying the opinion.

Both sides cite the same five principles of extraterritorial authority generally recognized under international law: the territorial, nationality, protective, universality, and passive personality principles. *See Rocha,* 288 F.2d at 549 n.4. Appellants argue that only the territorial principle (determining jurisdiction by reference to the place where the offense is committed) and the protective principle (determining jurisdiction by reference to the national interest injured by the offense) have been accepted as valid bases of authority by American courts and attempt to harmonize the substantial case law into one or the other of the two categories. Thus, they contend, only acts committed within the United States or conduct abroad that threatened American security, sovereignty, or operation of government functions have been—or can be—subject to federal law, and they argue that their acts—and the reach of § 959—do not qualify.

■ We think this argument fails. In upholding statutes with extraterritorial impact, courts have recognized that the territorial concept of jurisdiction is neither exclusive nor a full and accurate characterization of the powers of states to exercise jurisdiction beyond the confines of their geographical boundaries. *United States v. Rodriguez,* 182 F.Supp. 479, 488 (S.D.Cal. 1960), *aff'd sub nom. Rocha v. United States,* 288 F.2d 545 (9th Cir. 1961).

> From the body of international law, the Congress may pick and choose whatever recognized principle of international jurisdiction is necessary to accomplish the purpose sought by the legislation. The

mere fact that, in the past, Congress may not have seen fit to embody in legislation the full scope of its authorized powers is not a basis for now finding that those powers are lacking.

182 F.Supp. at 491. While it may be true that several cases upholding extraterritorial jurisdiction involve some injury to the sovereign integrity of the United States, the extraterritorial effect of federal penal laws has not been limited to those cases.

■ Thus, even if appellants were able to reconcile all precedents into one or the other of the categories which they recognize, they have not established that authority under one of the other three principles would not also be acceptable. Since both appellants are United States citizens, the nationality principle would apply: American authority over them could be based upon the allegiance they owe this country and its laws if the statute concerned, as does § 959, evinces a legislative intent to control actions within and without the United States. *See, e.g., Blackmer v. United States,* 284 U.S. 421, 437, 52 S.Ct. 252, 76 L.Ed. 375 (1932); *United States v. Bowman,* 260 U.S. 94, 97–98, 43 S.Ct. 39, 67 L.Ed. 149 (1922); *The Apollon,* 22 U.S. (9 Wheat.) 362, 369–70, 6 L.Ed. 111 (1824); *United States v. Pizzarusso,* 388 F.2d 8, 10 (2d Cir.), *cert. denied,* 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); *Rocha v. United States,* 288 F.2d 545, 548 (9th Cir. 1961); *United States v. Daniszewski,* 380 F.Supp. 113, 116 (E.D.N.Y.1974).

Appellants attempt to distinguish these precedents away by arguing that they could have been, or were, also justified under the territorial or protective principles. Even were that so, however, that does not vitiate the courts' recognition of the nationality principle as a valid source of authority. We are not persuaded why we should strain our reading of these cases to reach appellants' desired conclusion.

■ In any event, appellants' prosecution for violating § 959 could also be justified under the territorial principle, since American courts have treated that as an "objective" territorial principle. As ex-

pressed by the Supreme Court in *Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911):

> Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power.

*See also United States v. Cotten,* 471 F.2d 744, 749 (9th Cir.), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *Rocha v. United States,* 288 F.2d 545, 548 (9th Cir. 1961). Since appellants' activity in Japan was intended to, and did, have an actual adverse impact in the United States—the further distribution of the heroin here—they can be held subject to American law as if they had acted within American territory.

We conclude that the jurisdictional reach of § 959 is properly within the scope of Congress' legislative power and that the statute is constitutional as applied to appellants.

#### F. Sufficiency of Evidence

Appellant Powell was charged in Count Eight with distribution of heroin and was found guilty of that charge by the jury in the first trial. Here he challenges the sufficiency of the evidence against him on that count.

On review of a sufficiency question, the court must view the evidence in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and the findings of the trier of fact may not be set aside unless clearly erroneous, *United States v. Glover,* 514 F.2d 390 (9th Cir.), *cert. denied,* 423 U.S. 857, 96 S.Ct. 108, 46 L.Ed.2d 83 (1975). Powell argues that this Court must determine whether "reasonable minds could find that the evidence excludes every hypothesis but that of guilt," citing *Lee v. United States,* 376 F.2d 98, 101 (9th Cir. 1967). A *Lee*-type formulation has been rejected as a jury guide in *Holland v. United States,* 348 U.S. 121, 137–38, 75 S.Ct.

127, 99 L.Ed. 150 (1954), because of its confusing nature. This circuit has found the *Lee* test incorrect as a guide for the reviewing court. *United States v. Nelson,* 419 F.2d 1237, 1242–44 (9th Cir. 1969). The proper test is whether the jurors could rationally conclude from the evidence presented that guilt was established beyond a reasonable doubt. *Id.* at 1242–43. *See United States v. Turner,* 528 F.2d 143 (9th Cir. 1975), *cert. denied,* 423 U.S. 857, 96 S.Ct. 108, 46 L.Ed.2d 83 (1975); *United States v. Gardner,* 475 F.2d 1273 (9th Cir.), *cert. denied sub nom. LeBoulanger v. United States,* 414 U.S. 835 (1973).

 Appellant does not challenge the fingerprint evidence linking him to the criminal activity of which he was convicted. Upon a review of the evidence, we believe that the jury could reasonably find as it did.

AFFIRMED.